STATE OF NORTH CAROLINA v. DANE LOCKLEAR, JR.

No. 578A05

(Filed 28 August 2009)

## 1. Evidence— prior crimes or bad acts—murder—similar offense—distinct from joinder—admissibility

The trial court did not abuse its discretion in a prosecution for first-degree murder by admitting evidence of a prior murder. The decision about joinder of offenses does not necessarily determine the presence of a transactional connection between the offenses and does not determine the admissibility of evidence. Here, there were similarities between the murders and the 32 month period between the offenses is not too remote and goes to the weight of the evidence rather than the admissibility.

## 2. Evidence— prior crimes or bad acts—defendant's admission—convicted felon and prior murder—explanation of events—motive

There was no plain error in a first-degree murder prosecution where a statement was admitted from defendant in which he admitted being a convicted felon and being involved in a prior murder. The statements objected to were an integral part of defendant's explanation of events and were relevant to motive, and defendant did not show that the jury would have found him not guilty without the statement or that its admission constituted a fundamental error resulting in a miscarriage of justice.

## 3. Evidence— prior crimes or bad acts—drug-related—other evidence—no plain error

In light of the evidence against defendant, there was no plain error in a first-degree murder prosecution in the admission of a statement from defendant that he had been involved in drug-related activities.

## 4. Constitutional Law— Confrontation Clause—forensic reports—not prejudicial

The admission of forensics reports from a pathologist and dentist who did not testify violated the Confrontation Clause where the State did not show that either witness was unavailable or that defendant had a prior opportunity to cross-examine them. However, the evidence would not have influenced the verdict in

light of the other evidence and because the defendant was also found guilty under the felony murder rule (where the autopsy played no role).

**5. Evidence— letter received by inmate—not authenticated— admissibility to show credibility**

An unauthenticated letter in which defendant purportedly asked an incarcerated witness to change her story was otherwise irrelevant but admissible on redirect examination in response to defendant's attack on the inmate's credibility. The letter showed her willingness to come forward and cooperate. Even assuming error, such error was not prejudicial.

**6. Homicide— second-degree murder—lesser-included offense—instruction denied**

The trial court did not err in a first-degree murder prosecution by not giving the requested instruction on second-degree murder as a lesser-included offense where there was clear evidence supporting each element of first-degree murder, and defendant did not show that rage rendered him incapable of deliberate thought and the ability to reason. The only evidence of rage was from defendant's own statements. Moreover, the argument concerning premeditation and deliberation has no bearing on his conviction under the felony murder rule.

**7. Homicide— felony murder—merger with assault—further felony of arson**

The trial court did not err by submitting felony murder to the jury where defendant argued that the killing should have merged with the underlying assault, but there was also the underlying felony of arson.

**8. Constitutional Law— effective assistance of counsel— conflict of interest—counsel defending ineffectiveness allegation**

Defendant did not show ineffective assistance of counsel due to an alleged conflict of interest where a pretrial hearing was held concerning the withdrawal of two experts from the case. Defendant cannot fault defense counsel for privileged information disclosed by third parties, protected work product was not revealed, and delays were not solely the result of deficient performance by counsel.

**9. Criminal Law— judge's comments—recusal—denied**

There was no error in the denial of a motion to recuse where the judge's single reference to his past interaction with defendant did not demonstrate any personal bias or prejudice against defendant, and there was no evidence of a decision based on emotion rather than evidence.

**10. Sentencing— capital—instructions—mental retardation**

The trial court erred in a capital sentencing proceeding by not giving defendant's requested instruction that he would be sentenced to life without parole if the jury found mental retardation. The average jury may not understand what a finding of mental retardation will mean for a defendant.

Justice MARTIN dissenting.

Justice BRADY dissenting.

Justice NEWBY joins in the dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Robert F. Floyd, Jr. on 13 June 2005 in Superior Court, Robeson County, upon a jury verdict finding defendant guilty of first-degree murder. On 2 January 2008, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 8 September 2008.

*Roy Cooper, Attorney General, by William B. Crumpler, Joan M. Cunningham, and Amy C. Kunstling, Assistant Attorneys General, for the State.*

*Staples S. Hughes, Appellate Defender, by Constance E. Widenhouse, Assistant Appellate Defender; and Janet Moore for defendant-appellant.*

TIMMONS-GOODSON, Justice.

Defendant Dane Locklear, Jr. was indicted for one count each of first-degree murder, felonious larceny, burning of personal property, and first-degree arson. The case was tried capitally, and on 1 June 2005, the jury returned verdicts finding defendant guilty of the first-degree murder of Frances Singh Persad on the basis of malice, premeditation, and deliberation, and also under the felony murder rule on the bases of assault with a deadly weapon inflicting serious injury

and arson. The jury also found defendant guilty of misdemeanor larceny, burning of personal property, and first-degree arson. Following a mental retardation hearing, the jury found defendant was not mentally retarded. The capital sentencing hearing proceeded, after which the jury recommended a sentence of death.

Defendant appealed his capital conviction to this Court, and we allowed his motion to bypass the Court of Appeals as to his other convictions. We find no error in defendant's trial, but we vacate his death sentence and remand for a new sentencing hearing.

## FACTUAL BACKGROUND

The State presented evidence that in the early morning hours of 27 February 2000, firefighters responded to reports of a fire at the residence of Frances Singh Persad at 52 Beck Street in Red Springs, North Carolina. When they arrived at the scene, firefighters found the home engulfed in flames. After extinguishing the fire, firefighters discovered the charred body of Persad lying on the floor of the front bedroom. A bloodied one-by-four board, a bed slat, lay next to her body. Persad's vehicle, a red Ford Mustang, was not at the home. The shotgun that Persad normally kept in her bedroom was also missing. The subsequent criminal investigation revealed the fire was intentionally set and that Persad died from carbon monoxide poisoning. Persad also sustained blunt-force injuries to her head and sharp-force injuries to her neck. Investigators soon focused their attention on defendant, whom Persad had befriended while he was a patient at Southeastern Regional Medical Center. Persad worked at the medical center as a psychiatric nurse, and her initial friendship with defendant had developed into a sexual relationship.

Several days later, on 1 March 2000, a land surveyor working in a rural wooded area in Robeson County discovered Ms. Persad's red Ford Mustang. The wooded area was near a canal with a dirt road beside it, known as "Canal Road." The Mustang was burned down to bare metal and was still smoking. Defendant's extended family resided in the area. Upon searching the area, police found defendant hiding in a nearby house.

Heather Justice testified on behalf of the State. Justice stated defendant was an acquaintance of her former boyfriend, John Campbell. Justice testified defendant sold Campbell a "very large black weapon," a gun, in exchange for "a little over 200 pieces of dope" worth "$200." Other witnesses established that this was the

same shotgun belonging to Persad. Justice further testified that defendant and Campbell arrived at her residence one Sunday early morning in February of 2000. Defendant was driving a red Mustang, and Campbell was sitting in the passenger seat of the vehicle. Campbell came into the house and asked whether defendant could use the bathroom. As defendant entered the residence, Justice noticed he appeared to have fresh blood on his hands and clothes. After defendant went into the bathroom, Justice asked Campbell "what was going on, what did he do—what was he bringing people with blood in my house for." Defendant left approximately ten minutes later.

The State introduced into evidence several statements defendant gave to law enforcement officers in which he confessed to killing Persad. One statement was audiotaped, while the second was videotaped. Defendant told Detective Ricky Britt of the Robeson County Sheriff's Office and several other law enforcement officers that Persad picked him up on the evening of 26 February 2000 after completing a second shift at the hospital. Persad drove them in her red Mustang to her home. Defendant and Persad were drinking in bed together after sexual intercourse when they began to argue. Although defendant could not recall the exact subject of their disagreement, defendant stated that Persad was angry with him because he had taken a shotgun from her house a few days earlier. The argument "upset" him, and Persad was "screaming" at him. Defendant told Detective Britt that "the next thing [he knew] is that [he] had grabbed a two by four that was in her room . . . and [] began beating her with it." According to defendant, Persad attempted to reach the telephone to call 911, but he beat her down. She said she "didn't want to die." Defendant continued to beat Persad in the head with the board until he believed she was dead. He checked her heartbeat, but "knew she was gone." She bled profusely, and defendant had "a lot of blood" on him. Defendant then set the curtains and couch on fire and fled the home. He drove Persad's Mustang to a river, where he attempted to wash the blood from his body and clothes. Defendant eventually drove to a rural area near Canal Road and burned the Mustang.

While confessing to Persad's murder, defendant confessed to a second killing that occurred several years earlier. Defendant told Detective Britt he killed a young woman named Cynthia Wheeler, who was a student at the University of North Carolina at Pembroke at the time of her disappearance in June of 1997. At that time, investigators found Wheeler's vehicle at the same location near the canal

where Persad's vehicle was discovered. Like Persad's Mustang, Wheeler's vehicle was burned down to bare metal. The skeletal remains of Wheeler's body were found several months later along the same canal, approximately one to two miles away from where Wheeler's burned vehicle was located. Defendant told Detective Britt that he and Wheeler engaged in sexual intercourse in her vehicle, but that Wheeler became angry when she discovered defendant was not wearing a condom. Wheeler scratched defendant's face, which "upset" him. Defendant beat Wheeler in the face, then allowed her to dress. Wheeler told defendant she intended to tell law enforcement officers that defendant raped her, then began to run away. Defendant caught her, then beat and choked her. Wheeler told him, "[p]lease don't do this." At some point, defendant realized he had "gone too far" and "tried to wake her up." He checked her pulse and heartbeat. When he realized Wheeler was dead, he dumped her body in a wooded area along the canal and burned her vehicle.

The jury found defendant guilty of the first-degree murder of Frances Persad on the basis of premeditation and deliberation, as well as under the felony murder rule, with both assault with a deadly weapon inflicting serious injury and arson as underlying felonies. The case proceeded to sentencing.

Defendant presented evidence of mental retardation at the sentencing hearing. Dr. Timothy Hancock, a clinical psychologist, testified as an expert in cognitive impairment or mental retardation. Dr. Hancock testified he considered defendant's case "a slam dunk for retardation" and that it was one of the few *pro bono* cases his clinic accepted every year "based on merit and the strength of the findings." Dr. Hancock testified defendant obtained a full scale IQ score of 68 on the Wechsler Adult Intelligence Scale ("WAIS") test he administered to defendant in January 2005. Dr. Hancock's testing also showed defendant's adaptive functioning was significantly deficient in social skills, communication skills, self-care, work skills, and community use. Dr. Hancock stated that, in his opinion, defendant was mentally retarded as defined by the North Carolina General Statutes.

Dr. Hancock also testified to earlier testing of defendant. In September 2004 defendant obtained a full scale IQ score of 69 under a WAIS IQ test administered by another clinical psychologist, Dr. Brad Fisher. Dr. Fisher determined that defendant had adaptive deficits in functional academics, self-care, community use, and work skills. Dr. Fisher concluded defendant was mentally retarded.

According to Dr. Hancock, defendant's school records confirmed he had significant impairment in the functional academics area. In 1984, when defendant was fourteen years old, he had an IQ score of 65 on the Slosson IQ test and an IQ score of 69 on the Stanford-Binet IQ test. The Slosson test results showed defendant had a mental age of nine years at the time. Defendant was placed in "educably [sic] mentally handicapped" classes in 1984. Dr. Hancock stated this was "the educational version of mentally retarded." Defendant dropped out of school at the age of sixteen when his mother died.

The State presented evidence of defendant's records from Southeastern Regional Mental Health, as well as his medical records from the Department of Correction. Although defendant had been previously diagnosed with antisocial personality disorder, post-traumatic stress disorder, depression, and cocaine, alcohol, and marijuana dependence, his intellectual functioning was diagnosed as borderline and not retarded. The State also presented evidence that defendant kept several books and letters in his prison cell. Records from the Department of Correction showed diagnoses of defendant's "malingering."

During the charge conference for the mental retardation issue, defense counsel requested the trial court to instruct jurors that, should they find defendant mentally retarded, he would be sentenced to life imprisonment without parole. Defense counsel argued "not to include that, you know, the jury would have no way of knowing what would happen to a defendant if he's found mentally retarded, whether he's going to go free or what's to happen to him. So, they need to know that he's going to—you know, he is still going to be in prison for life without parole. Defense counsel repeated the request:

> .Where it says the law provides that no defendant who is mentally retarded shall be sentenced to death, and I ask the Court to also include an additional sentence or paraphrase after that that upon a finding that a defendant is mentally retarded, he will be sentenced to life without parole. As I said, I explained that so the jury would know that Mr. Locklear is going to be in jail for life without parole. Because otherwise, they don't know what's going to happen to him if they should find that he's mentally retarded. If they don't know what's going to happen to him, your Honor, that may cause a concern if they find him retarded, you know, what's to happen to him, where is he going to go.

The prosecutor argued the instruction was unnecessary. The following colloquy then occurred:

THE COURT: As we discussed at the bench, is there anything to prevent counsel for either the State or defendant arguing the law as it relates to what type of punishment would be imposed upon a finding of either mental retardation or no mental retardation?

[PROSECUTOR]: I'm not aware of any restriction.

THE COURT: So, you're not arguing that the defendant cannot argue to the jury—

[PROSECUTOR]: He can argue it.

THE COURT: —if you find him mentally retarded, then he will be sentenced in accordance with the law of the state of North Carolina to life in prison without parole?

[PROSECUTOR]: That's consistent.

[DEFENSE COUNSEL]: I sort of beg to differ. To say that he's not to be sentenced to death doesn't explain to the jury what's going to happen to him. And if I get in an argument and say, well, if you find he's retarded, he gets a life sentence, here comes the instruction that says something different, that doesn't include that in there—

THE COURT: There's two big different things.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: One is something different and one doesn't include it in—

[DEFENSE COUNSEL]: Well, if I say something that's not included in the instructions, then what's the jury going to think? They listen to the Court's instructions of law, and this said, you know, that's what the instruction—what's going to happen to him, and they don't know, and that's the big question. And that will be the big question, and that's a reasonable question for them to have, well, if I find him retarded, what's going to happen to him.

The trial court denied defendant's requested instruction.

The jury found defendant was not mentally retarded. Following the presentation of evidence on mitigating and aggravating circumstances, the jury recommended a sentence of death.

Additional facts will be provided as needed to discuss specific issues pertaining to defendant's assignments of error.

## GUILT-INNOCENCE PHASE

### Evidentiary question on the two murders

[1] Defendant argues the trial court erred in allowing the State to introduce evidence that defendant killed Cynthia Wheeler in 1997. Although defendant was charged with murdering both Persad and Wheeler, the offenses were not joined for trial. Defendant asserts that the severance of the cases indicates the underlying factual circumstances surrounding the murders were too dissimilar to allow joinder of the offenses. This dissimilarity, contends defendant, militates against introduction of the evidence of Wheeler's murder. Defendant argues the evidence of Wheeler's murder was introduced for no legitimate purpose other than to demonstrate his propensity to kill Persad, and that introduction of the evidence unduly prejudiced him, requiring a new trial.

Defendant concedes that admission of evidence of a prior offense under Rule of Evidence 404(b) differs from joinder of offenses. *See, e.g., State v. Greene*, 294 N.C. 418, 423, 241 S.E.2d 662, 665 (1978) (noting that whether offenses may be properly joined is a separate question from whether evidence from one case may be properly admitted at the trial of the other). Although the decision to join offenses for trial often involves considerations similar to those reviewed when determining whether to admit evidence of a prior offense under Rule 404(b), the decision to join or not join offenses does not determine admissibility of evidence under Rule 404(b). *State v. Cummings*, 326 N.C. 298, 308-11, 389 S.E.2d 66, 72-73 (1990) (holding that, although the offenses were not joined for trial, the trial court properly admitted evidence of one murder at the trial of the other under Rule 404(b)); *State v. Corbett*, 309 N.C. 382, 388-89, 307 S.E.2d 139, 144 (1983) (determining that joinder of the offenses, although improper, was not prejudicial in part because "[e]vidence of each of these offenses would have been admissible in the separate trials of the others in order to prove the identity of the assailant"). Moreover, the decision to join two or more offenses for trial is discretionary and does not necessarily indicate the lack of a transactional connection between the offenses. *See* N.C.G.S. § 15A-926(a) (2007); *State v. Chapman*, 342 N.C. 330, 342-43, 464 S.E.2d 661, 668 (1995) (noting that the decision to consolidate for trial offenses having a transactional connection is within the discretion of the trial court), *cert.*

*denied*, 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996). Thus, although the offenses may be sufficiently connected such that joinder would be permissible, the trial court may properly decline to consolidate them for trial. *See* N.C.G.S. § 15A-926(a). Defendant does not contest the trial court's decision to try the two murders separately. We therefore do not agree with defendant that the failure to consolidate the two offenses required exclusion of all evidence of Wheeler's murder. We now examine whether the evidence was otherwise properly admitted.

Rule of Evidence 404 provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

*Id.* § 8C-1, Rule 404(b) (2007). Rule 404(b) is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Thus, as long as the evidence of other crimes or wrongs by the defendant " 'is relevant for some purpose *other than* to show [the] defendant['s] . . . propensity' " to commit the charged crime, such evidence is admissible under Rule 404(b). *Id.* at 279, 389 S.E.2d at 54 (quoting *State v. Bagley*, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)).

Here, the trial court noted the following similarities between the murders:

> [Both victims are] females; that an argument arose between the Defendant and each of the victims during sexual intercourse, or at or around the time of sexual intercourse. That the Defendant beat them with both his hands and at some point—struck them with his hands during the argument. I do note that he further testified and his statement further indicated—the oral and video statement, he further hit Ms. [Persad] with a two-by-four. And I think in both instances he checked the pulse of the victims, or checked to see if they were, in fact, deceased or dead, then he made efforts to dispose of the bodies.

In Ms. Wheeler's case he took the body on the hood of a vehicle to—off of Canal Road and disposed of it in the woods. And in Ms. [Persad's] case he set the house afire. Both instances, according to his statement, he indicated he had just lost control, in effect, blacked out. As to both of the victim's vehicles, they were burnt off or near Canal Road within 100 to 200 feet of each other. That the death of Cynthia Wheeler occurred on or about June of 1997. That the death of [Frances Persad] occurred on or about February 27, the year 2000. That the proximity and time between the two—or the amount of time between the two alleged deaths and murders is not so remote as to diminish the probative value.

The trial court further noted that the arguments between defendant and the victims arose as a result of alleged misconduct on the part of defendant. The trial court ruled the evidence of Wheeler's death was admissible for purposes of showing defendant's knowledge, plan, opportunity, intent, *modus operandi*, and motive to kill Persad. The trial court also determined the evidence was more probative than prejudicial.

Although defendant argues the murders are temporally and factually distinct from one another, the trial court's findings indicate significant similarities between the deaths of the victim and Wheeler. As for the thirty-two month time lapse between the deaths, "remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991) (citing *State v. Smoak*, 213 N.C. 79, 93, 195 S.E. 72, 81 (1938)); *see also State v. Peterson*, 361 N.C. 587, 600-03, 652 S.E.2d 216, 226-27 (2007)) (holding that, when there were significant similarities between the death of the defendant's wife and the death of a woman sixteen years earlier with whom the defendant had a close personal relationship, the trial court did not abuse its discretion by admitting evidence of the prior death, even though the defendant was never criminally charged with the earlier death), *cert. denied*, —— U.S.——, 170 L. Ed. 2d 377 (2008).

Defendant argues that, even if admissible, the evidence was excessively prejudicial, requiring its exclusion under Rule of Evidence 403. We review a trial court's decision to admit or exclude evidence under Rule 403 for abuse of discretion. *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008) (citing *Peterson*, 361 N.C. at 602-03, 652 S.E.2d at 227). We reverse the trial court only when " 'the court's

ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* (quoting *Peterson*, 361 N.C. at 602-03, 652 S.E.2d at 227 (citations and internal quotation marks omitted)). " 'In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record.' " *Id.* (quoting *Peterson*, 361 N.C. at 603, 652 S.E.2d at 227 (citations and internal quotation marks omitted)). We hold the trial court did not abuse its discretion in admitting evidence of the Wheeler murder.

Defendant assigns error to four other instances in which he asserts the trial court erroneously admitted evidence of other prior bad acts. The objectionable evidence includes: (1) defendant's video-taped statement in which he mentions being a convicted felon; (2) defendant's audiotaped statement in which he identifies a certain mobile home as one where he sold drugs; (3) testimony by a witness that defendant sold the shotgun he took from Persad in exchange for illegal drugs; and (4) testimony by a detective that a visitor attempted to smuggle cocaine and marijuana to defendant while he was being held at the sheriff's office. Defendant contends the evidence of his criminal record and drug-related activities was irrelevant to any material issue at trial and unfairly prejudicial. Defendant asserts that the cumulative prejudicial effect of these errors warrants a new trial. We disagree.

To the extent defendant failed to object to introduction of much of the evidence he now contends was inadmissible, or objected on grounds other than those now argued on appeal, he has waived his right to appellate review other than for plain error. We reverse for plain error only in the most exceptional cases, *see State v. Garcell*, 363 N.C. 10, 35-36, 678 S.E.2d 618, 634 (2009) (quoting *State v. Raines*, 362 N.C. 1, 16, 653 S.E.2d 126, 136 (2007)), and only when we are convinced that the error was either a fundamental one resulting in a miscarriage of justice or one that would have altered the jury's verdict. *See id.* at 35-36, 678 S.E.2d at 634-35.

We now examine each of the four instances in turn. The first instance arises from defendant's videotaped statement in which he confesses to killing Wheeler. In the statement, defendant describes how Wheeler became angry with him during sexual intercourse when she discovered he was not wearing a condom as he had promised to do. Wheeler scratched his face, which "upset" him. He beat her in the face in the back seat of the car, but then stopped and allowed her to dress. As she was leaving the vehicle, Wheeler told defendant she was

going to tell law enforcement that defendant raped her. She then ran away. Wheeler's threat angered and concerned defendant, because he believed that, as she was a college student and he was already a convicted felon, law enforcement "would not believe [him] over her."

**[2]** Defendant contends the evidence that he was a convicted felon was improperly admitted because evidence of prior convictions is inadmissible when the defendant does not testify. *See* N.C.G.S. § 8C-1, Rule 609 (2007) (permitting admission of evidence of prior convictions when the defendant testifies); *State v. Badgett*, 361 N.C. 234, 247, 644 S.E.2d 206, 214 (stating that "it is error to admit evidence of the defendant's prior conviction when the defendant does not testify" (citations omitted)), *cert. denied,* —— U.S. ——, 169 L. Ed. 2d 351 (2007). At trial, however, defendant only objected to the evidence on the ground it violated Rule 404(b). Defendant is therefore limited to plain error review of this argument. We conclude defendant has failed to show that the jury would have found him not guilty of murdering Persad absent his statement in the videotape that he was a convicted felon or that admission of this evidence constituted fundamental error resulting in a miscarriage of justice.

Defendant further asserts, as he did at trial, that admission of the evidence violated Rule of Evidence 404(b). The trial court overruled defendant's objection. Defendant argues the evidence only related to the Wheeler case and was irrelevant to the murder of Persad. We do not agree. Defendant's status as a convicted felon was an integral part of his explanation regarding the sequence of events and his motive in killing Wheeler. Wheeler threatened to accuse him of rape, and defendant believed law enforcement would discount his version of events because of his prior conviction. Wheeler's threat angered and concerned defendant, whereupon he chased her down and killed her. This evidence, in turn, was probative of defendant's murder of Persad insofar as it tended to show both defendant's possible motive in killing Persad—to prevent her from reporting the theft of her shotgun to police—and his *modus operandi*. We moreover conclude that, even if erroneously admitted, such admission did not prejudice defendant.

**[3]** The next three instances of admission of evidence to which defendant has assigned error concern his involvement in drug-related activities. As noted above, this evidence included that defendant once sold drugs, that he sold the shotgun belonging to Persad for drugs, and that one of his visitors while he was at the sheriff's office

attempted to smuggle cocaine and marijuana to him by hiding the drugs in some food. Defendant, however, either did not object to admission of the evidence, or failed to state any grounds for his objection. He has therefore failed to preserve these assignments of error for review other than for plain error. *See Garcell*, 363 N.C. at 35, 678 S.E.2d at 634. In light of the evidence against defendant, we conclude that admission of the evidence of defendant's drug-related activities would not have influenced the jury's verdict. We therefore overrule these assignments of error.

*Crawford issue of admitting opinion evidence*

[4] Defendant argues the trial court erred in admitting opinion testimony as to the cause of Wheeler's death rendered by a non-testifying pathologist and opinion testimony from a non-testifying dentist about the identity of Wheeler's remains. Although we agree that admission of the testimony violated the dictates of *Crawford* and was therefore erroneous, we find such error harmless beyond a reasonable doubt.

The State tendered John D. Butts, M.D., the Chief Medical Examiner for North Carolina, as an expert in the field of forensic pathology. Dr. Butts testified as to State's Exhibit 101, which Dr. Butts identified as a copy of an autopsy report for Cynthia Wheeler. The autopsy report was prepared by Karen Chancellor, M.D., a forensic pathologist who performed the autopsy on Wheeler's body in 1997. Dr. Butts testified that, according to the autopsy report prepared by Dr. Chancellor, the cause of Wheeler's death was blunt force injuries to the chest and head. Dr. Butts also testified to the results of a forensic dental analysis performed by Dr. Jeffrey Burkes, a consultant on the faculty of the University of North Carolina School of Dentistry. The forensic dental analysis was included in the autopsy report. Dr. Butts stated that, by comparing Wheeler's dental records to the skeletal remains, Dr. Burkes positively identified the body as that of Wheeler. Neither Dr. Chancellor nor Dr. Burkes testified.

Defense counsel objected to Dr. Butts's testimony regarding Wheeler's autopsy, as well as to admission of the autopsy report, on the grounds that, *inter alia*, admission of the evidence violated defendant's Sixth Amendment right to confront the witnesses against him. The trial court overruled the objections. Defendant argues the trial court erred in admitting opinion testimony by non-testifying witnesses as to the cause of Wheeler's death and the identity of her remains. We agree, but determine that admission of the evidence did not prejudice defendant.

**STATE v. LOCKLEAR**

[363 N.C. 438 (2009)]

The Confrontation Clause of the Sixth Amendment bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203 (2004); *State v. Lewis*, 361 N.C. 541, 545, 648 S.E.2d 824, 827 (2007). The State argues the autopsy report was not "testimonial" and therefore, is not barred by the Confrontation Clause. However, the United States Supreme Court squarely rejected this argument in the recent case of *Melendez-Diaz v. Massachusetts*, —— U.S. ——, 129 S. Ct. 2527, —— L. Ed. 2d —— (2009). There, the defendant objected on *Crawford* grounds to the introduction of a forensic analysis performed by a non-testifying analyst. The evidence at issue identified a substance seized by law enforcement officers and linked to defendant as cocaine. The Court determined that forensic analyses qualify as "testimonial" statements, and forensic analysts are "witnesses" to which the Confrontation Clause applies. *See id.* at ——, 129 S. Ct. at 2532, —— L. Ed. 2d at ——. The Court specifically referenced autopsy examinations as one such kind of forensic analyses. *See id.* at ——, n.5, 129 S. Ct. at 2536, n.5, —— L. Ed. 2d at ——. Thus, when the State seeks to introduce forensic analyses, "[a]bsent a showing that the analysts [are] unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them" such evidence is inadmissible under *Crawford. Id.* at ——, 129 S. Ct. at 2532, —— L. Ed. 2d at ——; *see also State v. Watson*, 281 N.C. 221, 229-32, 188 S.E.2d 289, 294-96 (holding the trial court erred in admitting evidence of the cause of the victim's death contained in the victim's death certificate), *cert. denied*, 409 U.S. 1043, 34 L. Ed. 2d 493 (1972).

Here, the State sought to introduce evidence of forensic analyses performed by a forensic pathologist and a forensic dentist who did not testify. The State failed to show that either witness was unavailable to testify or that defendant had been given a prior opportunity to cross-examine them. The admission of such evidence violated defendant's constitutional right to confront the witnesses against him, and the trial court therefore erred in overruling defendant's objections. We must now determine whether admission of the evidence was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2007) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless . . . it was harmless beyond a reasonable doubt."); *Lewis*, 361 N.C. at 549, 648 S.E.2d at 830.

STATE v. LOCKLEAR

[363 N.C. 438 (2009)]

The evidence erroneously admitted tended to establish two facts: (1) positive identification of Wheeler's body; and (2) the cause of Wheeler's death. Neither fact was critical, however, to the State's case against defendant for the murder of Persad. The State presented copious evidence that defendant killed Persad, including defendant's confessions to the crime. The State also presented other evidence of Wheeler's murder. Defendant admitted he killed Wheeler by beating and choking her to death and that he then burned her vehicle. We conclude the erroneously admitted evidence regarding Wheeler's cause of death and the identification of her body would not have influenced the jury's verdict. *See Watson*, 281 N.C. at 233, 188 S.E.2d at 296 (determining that, in light of the overwhelming evidence of the victim's murder by the defendant, "the minds of an average jury would not have found the evidence less persuasive had the conclusory evidence contained in the certified copy of the death certificate [of the victim] been excluded. The admission of the evidence contained in the certified copy of the death certificate was at most harmless error beyond a reasonable doubt." (citations omitted)).

In addition, as discussed above, the State presented evidence of Wheeler's murder to show defendant's knowledge, plan, opportunity, intent, *modus operandi*, and motive to commit the premeditated and deliberate murder of Persad. However, the jury also found defendant guilty under the felony murder rule, for which the erroneously admitted autopsy evidence regarding Wheeler played no role. Thus, even assuming *arguendo* that the wrongful admission of the autopsy evidence influenced the jury to find that defendant murdered Persad with premeditation and deliberation, that evidence would not affect the jury's verdict of guilt under the felony murder rule. Defendant has failed to show prejudice arising from this error.

*Overruled objections to re-direct examination of a witness*

[5] Defendant contends the trial court committed prejudicial error by overruling his objection to the State's re-direct examination of Heather Justice. Justice testified regarding defendant's exchange of Persad's shotgun for drugs, and his appearance at her home at the approximate time of Persad's death. Defendant was driving a red Ford Mustang and was spattered with fresh blood at the time.

Defense counsel cross-examined Justice regarding her previous criminal convictions, her inability to recall dates, and prior inconsistencies in her statements. At the time Justice testified, she was incarcerated for the manslaughter conviction of her boyfriend Campbell.

Upon re-direct, the State questioned Justice about a letter she received while serving her sentence. Over defendant's objections, Justice testified she believed the letter came from defendant and that in his letter, defendant asked her to "change [her] story." Defendant contends the letter was never authenticated as his, and its contents were therefore inadmissible.

However, "[t]he State has the right to introduce evidence to rebut or explain evidence elicited by defendant although the evidence would otherwise be incompetent or irrelevant." *State v. Johnston,* 344 N.C. 596, 605, 476 S.E.2d 289, 294 (1996) (citations omitted). "Such evidence is admissible to dispel favorable inferences arising from defendant's cross-examination of a witness." *Id.* at 605-06, 476 S.E.2d at 294 (citations omitted). Here, defense counsel sought to impeach Justice by cross-examining her regarding her manslaughter conviction and inability to recall certain dates. The State's re-direct attempted to restore Justice's credibility with the jury in part by demonstrating her willingness to come forward and cooperate with law enforcement. Thus, while evidence of the letter was otherwise irrelevant, it was admissible in response to defendant's attack on Justice's character during cross-examination. *See id.* We moreover conclude that, even assuming error, such error was not prejudicial. We overrule these assignments of error.

### Denial of instruction on second-degree murder

[6] Defendant asserts there was evidence from which the jury could have found him guilty of second-degree murder, and the trial court therefore erred in failing to submit the requested instruction to the jury. According to defendant's statements, he lost control while arguing with Persad and "the next thing [he knew]" he "had grabbed a two by four that was in her room . . . and began [] beating her with it." Defendant continued to beat Persad in the head until he believed she was dead, then set fire to the residence. Defendant argues the jury could find from this evidence that he was provoked to a state of blind rage by his argument with Persad, that he beat her while in that state of rage, and that he then set fire to the house believing she was already dead. Defendant contends the evidence justified submission of second-degree murder. We do not agree.

The well-established rule for submission of second-degree murder as a lesser-included offense of first-degree murder is: "If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, includ-

ing premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder." *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 203-04, 344 S.E.2d 775, 781-82 (1986). The evidence must be sufficient to allow a rational jury to find the defendant guilty of the lesser offense and to acquit him of the greater. *State v. Conaway*, 339 N.C. 487, 514, 453 S.E.2d 824, 841 (quoting *Beck v. Alabama*, 447 U.S. 625, 635, 65 L. Ed. 2d 392, 401 (1980)), *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995).

Here, there was clearly evidence to support each of the elements of premeditated and deliberate murder. The determinative question then becomes whether there was sufficient evidence to negate these elements such that the jury should have been allowed to consider second-degree murder. *See Strickland*, 307 N.C. at 293, 298 S.E.2d at 658. "The fact that the defendant was angry or emotional at the time of the killing will not negate the element of deliberation unless such anger or emotion was strong enough to disturb the defendant's ability to reason." *State v. Solomon*, 340 N.C. 212, 222, 456 S.E.2d 778, 785 (citation omitted), *cert. denied*, 516 U.S. 996, 133 L. Ed. 2d 438 (1995).

Thus, evidence that the defendant and the victim argued, without more, is insufficient to show that the defendant's anger was strong enough to disturb his ability to reason. Without evidence showing that the defendant was incapable of deliberating his actions, the evidence could not support the lesser included offense of second-degree murder.

*Id.*; *see also State v. Olson*, 330 N.C. 557, 564, 411 S.E.2d 592, 596 (1992) (indicating that a perpetrator " 'may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time' " (quoting *State v. Vause*, 328 N.C. 231, 238, 400 S.E.2d 57, 62 (1991))).

Defendant has failed to show that his rage was of such magnitude that it rendered him incapable of deliberate thought and ability to reason. The evidence showed that defendant struck Persad numerous times with a board, then set fire to the house. Under the "felled victim" theory of premeditation and deliberation, "when numerous wounds are inflicted, the defendant has the opportunity to premedi-

tate and deliberate from one shot [here, a blow] to the next." *State v. Austin*, 320 N.C. 276, 295, 357 S.E.2d 641, 653, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987). Even when a weapon " 'is capable of being fired rapidly, some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger.' " *Id.* As defendant physically beat Persad with a board, as opposed to firing a gun, he had even more time for thought and deliberation between each blow.

We moreover note that the only evidence of defendant's "blind rage" comes from his own statements to law enforcement. In *State v. Smith*, 347 N.C. 453, 496 S.E.2d 357, *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998), we concluded the defendant was not entitled to an instruction on second-degree murder when the State produced evidence that he set fire to an apartment building to destroy evidence of his earlier mail theft from residents. *Id.* at 463-64, 496 S.E.2d at 363. This Court held that the defendant's "self-serving statement that he set the fire as a prank," made shortly after the crime, "was not sufficient to support an instruction on second-degree murder." *Id.* at 464, 496 S.E.2d at 363. In addition, defendant's argument goes only to his conviction of premeditated and deliberate murder, and has no bearing on his conviction of first-degree murder under the felony murder rule. We overrule this assignment of error.

### Submitted first-degree felony murder based on felonious assault

**[7]** Defendant argues the trial court erred in submitting first-degree felony murder to the jury based on felonious assault as the underlying felony. Defendant asserts the evidence shows his assault of Persad with a board inflicted injuries that proximately led to her death. Defendant contends the assault should have merged with the murder charge and could not be used separately as a basis for felony murder. Assuming *arguendo* that defendant's position is correct, he cannot show reversible error. The jury convicted defendant of first-degree murder based on premeditation and deliberation, as well as under the felony murder rule, with both felonious assault with a deadly weapon inflicting serious injury and arson as the underlying felonies. Defendant's argument has no bearing on his conviction of premeditated and deliberate murder or felony murder based on arson. We overrule these assignments of error.

### Ineffective Assistance of Counsel

**[8]** Defendant contends he received ineffective assistance of counsel based on several grounds. First, defendant argues an actual conflict

of interest caused his counsel to disclose privileged information to the State, which the State then used against defendant. This asserted conflict arose in September of 2004, when the Capital Defender, Robert Hurley, sent a facsimile message to Judge Robert F. Floyd, Jr., the Senior Resident Superior Court Judge for Robeson County, expressing his concern over the withdrawal of two experts from defendant's case. Mr. Hurley had no prior involvement in defendant's case, in that counsel for defendant, William Davis and Donald Bullard, were appointed in March of 2000, before formation of the Office of Indigent Defense Services ("IDS") in July of 2001. Although both Mr. Davis and Mr. Bullard were experienced capital defense attorneys, neither had chosen to be included on the IDS roster. Mr. Hurley included in his facsimile to Judge Floyd copies of the two letters of withdrawal. The experts, psychiatrist Moira Artigues, M.D., and psychologist James Hilkey, Ph.D., stated in their letters that they were withdrawing because of trial counsel's failure to communicate and to supply them with information they had requested to review in order to render an opinion on defendant's case. The letters from Drs. Artigues and Hilkey were addressed to William Davis, but they were copied to Mr. Hurley. In his message to Judge Floyd, Mr. Hurley stated that the withdrawal of defendant's experts raised questions as to the adequacy of trial counsel's preparation for the case and the availability of alternative experts.

On 28 September 2004, one day after receiving the facsimile from Mr. Hurley, Judge Floyd held a hearing with defense counsel Davis and Robeson County district attorney L. Johnson Britt to determine defense counsel's preparedness for trial. Mr. Davis stated that his decision not to supply Drs. Artigues and Hilkey with the requested information, including "discovery and investigative reports," was deliberate "because they don't need the information to do an evaluation, a medical evaluation" and that the experts had "all the information . . . that I wanted them to have and I think they were entitled to." Mr. Davis stated that Drs. Artigues and Hilkey had never previously informed him that they felt unprepared to testify in defendant's case, and that, but for the now-absent experts, the case was ready for trial. Mr. Davis also complained that the letter from Mr. Hurley contained "information . . . privileged to our defense. He's got stuff in there about evaluations, substance abuse. And that's privileged information that he shouldn't—if he got it, he shouldn't be disclosing it."

Judge Floyd held a second, closed hearing on the matter to explore Mr. Hurley's intervention in the case. Defendant was present at

the hearing, along with defense counsel Davis and Bullard, as well as Mr. Hurley, district attorney Britt, Dr. Artigues, Dr. Hilkey, and several other persons. Judge Floyd cautioned all parties that, should they find it necessary to "disclose information that is pertinent to the defense of Mr. Locklear, [to] put the Court on notice prior to that .disclosure" so that such discussions could proceed outside the presence of Mr. Britt or anyone representing the State. Mr. Britt was absent from a portion of the hearing for this reason. Judge Floyd also expressed his belief that the resignation letters from Drs. Artigues and Hilkey contained no "information, in and of itself, in light of their resignation . . . that was at that point prohibited to be disclosed." At the hearing, Mr. Davis repeated his position that he had given Drs. Artigues and Hilkey "all the information that I had and that I intended for them to have as Mr. Locklear's attorney, and that I felt they should have."

Defendant asserts that, in revealing the letters from Mr. Hurley, Dr. Artigues, and Dr. Hilkey to district attorney Britt, and referring to them at the hearings, his counsel revealed confidential and privileged communications to the prosecution without authorization. These communications, argues defendant, contained "counsel's mental processes and work product on sensitive mental health issues." Defendant claims the State later used this information to attack the credibility of defendant's expert at the sentencing hearing. According to defendant, his attorneys "threw him under the bus" in an effort to protect themselves from accusations of dilatory performance. We are not persuaded.

First, it is unclear from the record who first disclosed the facsimile from Mr. Hurley, along with its accompanying letters from Drs. Artigues and Hilkey, to Mr. Britt. Defendant argues it was Mr. Davis, while the State contends it was Judge Floyd. While the transcript shows that Judge Floyd distributed copies of Mr. Hurley's facsimile to Mr. Davis and Mr. Britt at the 28 September hearing, it is silent on whether Mr. Britt had already obtained the facsimile by then. It seems unlikely that Mr. Davis would have given the facsimile to Mr. Britt, given his complaint to Judge Floyd that Mr. Hurley should not have included information in the letter Mr. Davis considered privileged. Defendant cannot fault defense counsel for privileged information disclosed by third parties.

Moreover, we do not conclude that disclosure of the privileged information prejudiced defendant. Although the letter from Mr.

Hurley included the statement that "defendant had an IQ of 65 when he was 14 years of age," this same information was disclosed in an affidavit attached to defendant's motion for a pretrial mental retardation hearing filed less than a week after Mr. Hurley sent the facsimile. References to defendant's history of substance abuse would also have worked no prejudice, as the prosecution was already aware that defendant had significant substance abuse issues. Defendant obtained other experts in time for his trial and did not rely on either Dr. Artigues or Dr. Hilkey. Defendant has failed to show that the outcome of his trial would have been different had the State not known of the experts' resignations and their reasons for doing so. *State v. Gainey*, 355 N.C. 73, 113, 558 S.E.2d 463, 488 (noting that, under *Strickland*, a defendant must show "he was prejudiced by his trial counsel's deficient performance to such a degree that 'but for counsel's unprofessional errors, the result of the proceeding would have been different' " (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698 (1984))), *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002).

The letters contained no protected work product prepared by defense counsel. Nor do we conclude Mr. Davis revealed protected work product when he responded to questioning by Judge Floyd. Mr. Davis appropriately responded to the trial court's questions in general terms. Although Mr. Davis noted he had "reasons" for not giving the appointed experts all the requested information, he did not reveal what his reasons were, or otherwise disclose trial strategy. *See State v. Prevatte*, 356 N.C. 178, 218, 570 S.E.2d 440, 462 (2002) (concluding that, "[b]ecause the attorneys described in general terms what had been done, rather than disclosing any of their mental processes, there was no work product violation" (citation omitted)), *cert. denied*, 538 U.S. 986, 155 L. Ed. 2d 681 (2003). Further, to the extent that the majority of defendant's argument focuses on prejudice arising at the sentencing proceeding, our disposition of his case renders these arguments moot.

Defendant also cites delay in his case as grounds for ineffective assistance. However, defendant does not demonstrate that the delay was due solely to deficient performance on the part of his counsel, nor that any delay prejudiced his case. Unfortunately, delay in capital cases is not unusual, particularly in Robeson County. Judge Floyd noted the "overwhelming number of capital cases to be tried here in Robeson County." While Judge Floyd expressed his concern over defense counsel's lack of communication with Dr. Artigues and Dr.

Hilkey, he found "[t]here has been no showing that any lapse of time and delay that has occurred has visited any prejudice upon [defendant] at this time." Defendant indicated at the hearing that he desired continued representation from Mr. Davis and Mr. Bullard. Judge Floyd predicted that, with the necessary delay of obtaining new experts, defendant's case would not be "tried [until] probably in the first half of [2005]." Defendant's case was tried in April of 2005.

Defendant assigns error to a number of further instances he contends constitute ineffective assistance of counsel. We have reviewed these contentions carefully and find them unpersuasive. We conclude defendant has failed to show he received ineffective assistance of counsel.

### Recusal

**[9]** Defendant argues prejudicial error occurred when his motion to recuse Judge Floyd was denied. Defendant contends Judge Floyd displayed "irrefutable bias" against defendant when he apparently told defense counsel in an unrecorded bench conference during argument on the defense motion for a pretrial hearing on mental retardation there was "no way" he would find defendant mentally retarded, based in part on his previous interactions with defendant. Judge Floyd denied the motion for a pretrial hearing on mental retardation. Defense counsel moved to recuse Judge Floyd from presiding over defendant's motion for a pretrial mental retardation hearing and the trial of defendant's case. Judge Floyd subsequently withdrew his ruling on the motion for a pretrial hearing on mental retardation and reset that motion, along with the recusal motion, before another judge, who denied both motions.

Upon motion by the defendant, judges must disqualify themselves from presiding over a criminal trial if they are "[p]rejudiced against the moving party or in favor of the adverse party." N.C.G.S. § 15A-1223 (2007). The Code of Judicial Conduct also suggests recusal when the impartiality of a judge "may reasonably be questioned . . . where [] [t]he judge has a personal bias or prejudice concerning a party." Code Jud. Conduct Canon 3C (1)(a), 2008 Ann. R. N.C. 475, 480.

Judge James F. Ammons, Jr. considered defendant's motions and denied them. Judge Ammons found as fact that: Judge Floyd made his remark "only after . . . reviewing all of the evidence and arguments" by counsel; after reviewing the same documents, he agreed with

Judge Floyd's conclusion that defendant was not entitled to a pretrial hearing based on the evidence; Judge Floyd never said he would not allow evidence on the issue of mental retardation to be presented to the jury; Judge Floyd was "extremely familiar with" the case, having heard many of the motions, and review of the transcripts of those motions demonstrated Judge Floyd's "knowledge of the case," as well as "his fairness and impartiality"; recusal of Judge Floyd would cause needless delay in an already delayed case; and there were no grounds for recusal.

We conclude that Judge Floyd's single reference to his past interaction with defendant does not demonstrate any personal bias or prejudice against defendant. Nor do we discern any evidence that Judge Floyd's decision to deny the motion for a pretrial mental retardation hearing was based on emotional, rather than evidentiary, considerations. Judge Floyd's denial of the pretrial hearing on mental retardation did not affect defendant's ability to present his mental retardation claim to the jury. We overrule this assignment of error.

## Jury Selection

Defendant presents several arguments regarding jury selection. Defendant contends the trial court improperly limited his questioning of prospective jurors about their views on mental retardation. The bulk of defendant's argument addresses the asserted need for a new sentencing hearing because of these alleged errors. In light of our decision to grant defendant a new sentencing hearing, we do not address these issues. To the extent defendant contends the jury selection errors were structural, requiring a new trial, we have considered these arguments and find them unpersuasive.

## SENTENCING PROCEEDING

[10] Defendant assigns error to the trial court's instructions to the jury on mental retardation. Specifically, defendant contends the trial court should have instructed the jury that a verdict finding him mentally retarded would result in a sentence of life imprisonment without parole. After careful consideration, we agree with defendant that heightened attention to procedural safeguards is necessary in cases of alleged mental retardation in order to protect against the inadvertent and unconstitutional execution of mentally retarded defendants. We conclude the trial court erred in refusing to give defendant's requested instruction, and that defendant was prejudiced thereby. We therefore remand for a new sentencing hearing.

Execution of the mentally retarded violates the Eighth Amendment's prohibition against excessive punishment. *See Atkins v. Virginia*, 536 U.S. 304, 321, 153 L. Ed. 2d 335, 350 (2002), *cited with approval in State v. Poindexter*, 359 N.C. 287, 292, 608 S.E.2d 761, 765 (2005). Even before the United States Supreme Court announced its decision in *Atkins*, the North Carolina General Assembly amended our capital punishment statutes to exempt mentally retarded defendants from receiving the death penalty. *See* Act of July 25, 2001, ch. 346, sec. 1, 2001 N.C. Sess. Laws 1038, 1038 (adopting N.C.G.S. § 15A-2005). Accordingly, our General Statutes now provide that "no defendant who is mentally retarded shall be sentenced to death." N.C.G.S. § 15A-2005(b) (2007). North Carolina's enactment of a prohibition on executing the mentally retarded was part of a national consensus, reflected by similar enactments in state legislatures across the country, that "our society views mentally retarded offenders as categorically less culpable than the average criminal." *Atkins*, 536 U.S. at 316, 153 L. Ed. 2d at 347. The Court in *Atkins* noted that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id*. at 317, 153 L. Ed. 2d at 347-48.

The task of identifying mentally retarded offenders can be a challenging one. *See id*. Our General Statutes define mental retardation as "[s]ignificantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18." N.C.G.S. § 15A-2005(a)(1)(a) (2007). "Significantly subaverage general intellectual functioning" is "[a]n intelligent quotient of 70 or below." *Id*. § 15A-2005(a)(1)(c) (2007). "Significant limitations in adaptive functioning" are defined as "[s]ignificant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills and work skills." *Id*. § 15A-2005(a)(1)(b) (2007).

Procedurally, upon motion by a defendant, the trial court in its discretion may order a pretrial determination of mental retardation. *See id*. § 15A-2005(c) (2007). The State must consent to such a hearing, at which the defendant "has the burden of production and persuasion to demonstrate mental retardation by clear and convincing evidence." *Id*. If the defendant shows to the satisfaction of the trial court that he is mentally retarded, the case may only proceed non-capitally. *Id*. Such procedure sensibly avoids the needless burden of

capital proceedings for those defendants whose mental retardation is clearly and convincingly evident.

If the trial court determines that a defendant has failed to show mental retardation by clear and convincing evidence, the defendant may seek a jury determination of mental retardation during the sentencing hearing. Subsection 15A-2005(e) provides:

> If the court does not find the defendant to be mentally retarded in the pretrial proceeding, upon the introduction of evidence of the defendant's mental retardation · during the sentencing hearing, the court shall submit a special issue to the jury as to whether the defendant is mentally retarded as defined in this section. This special issue shall be considered and answered by the jury prior to the consideration of aggravating or mitigating factors and the determination of sentence. If the jury determines the defendant to be mentally retarded, the court shall declare the case noncapital and the defendant shall be sentenced to life imprisonment.

N.C.G.S. § 15A-2005(e) (2007). Thus, the jury often has the unenviable task of identifying "gray area" defendants; that is, those offenders who are not *clearly* mentally retarded but who may nevertheless present enough evidence of mental retardation to render them ineligible for the death penalty. *See Atkins*, 536 U.S. at 317, 153 L. Ed. 2d at 348 (noting that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus"). Notably, the defendant's burden of production and persuasion to show mental retardation to the jury at the sentencing stage is lower than that required at the pretrial hearing stage. The defendant must only "demonstrate mental retardation to the jury by a preponderance of the evidence." N.C.G.S. § 15A-2005(f) (2007). The lesser burden of proof indicates legislative awareness of "gray area" defendants and lawmakers' intent to protect against the inadvertent execution of mentally retarded offenders.

Once evidence of mental retardation is presented to the jury at the sentencing proceeding, the trial court must "give appropriate instructions." *Id.* § 15A-2000(b) (2007). The significance of the requirement for "appropriate instructions" on the issue of mental retardation is apparent for several reasons. As previously noted, a jury finding of mental retardation renders the case noncapital. *Id.* § 15A-2005(e) ("If the jury determines the defendant to be mentally

retarded, the court shall declare the case noncapital and the defendant shall be sentenced to life imprisonment."). Identifying mentally retarded offenders can be an inherently difficult task requiring particular attention to procedural safeguards. *See Atkins*, 536 U.S. at 317, 153 L. Ed. 2d at 348 (noting that "some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards"). The difficulty of this task increases the likelihood that mentally retarded offenders will be unconstitutionally sentenced to death. *See id.* at 321, 153 L. Ed. 2d at 350 ("Mentally retarded defendants in the aggregate face a special risk of wrongful execution."). Careful instruction by the trial court is therefore important to "steadfastly guard[]" the procedural protections to which the defendant is entitled. *Id.* at 317, 153 L. Ed. 2d at 348.

In the present case, defendant presented substantial evidence of mental retardation to the jury during the sentencing proceeding. Dr. Hancock considered defendant's case "a slam dunk for retardation." Defense counsel requested that the trial court "include an additional sentence or paraphrase . . . that upon a finding that a defendant is mentally retarded, he will be sentenced to life without parole." Counsel argued that absent such instruction, the jury might mistakenly believe defendant would "go free" or otherwise misunderstand "what's to happen to him." The trial court refused defendant's request and instead gave the following pattern jury instruction: "The law provides that no defendant who is mentally retarded shall be sentenced to death. The one issue for you to determine at this stage of the proceedings reads: Is the defendant, Dane Locklear, Jr., mentally retarded?" 1 N.C.P.I.—Crim. 150.05 (2001).

It is well settled that "[i]f a request is made for a jury instruction which is correct in itself and supported by evidence, the trial court must give the instruction at least in substance." *State v. Harvell*, 334 N.C. 356, 364, 432 S.E.2d 125, 129 (1993) (citations omitted). In capital cases, the trial court is required to "give appropriate instructions in those cases in which evidence of the defendant's mental retardation requires the consideration by the jury of the provisions of G.S. 15A-2005." N.C.G.S. § 15A-2000(b). Section 15A-2005, in turn, provides that "[i]f the jury determines the defendant to be mentally retarded, the court shall declare the case noncapital and the defendant shall be sentenced to life imprisonment." *Id.* § 15A-2005(e). Defendant's requested instruction was therefore correct in itself and supported by evidence.

Given the relatively recent enactment of N.C.G.S. § 15A-2005, this Court has not previously had the opportunity to examine whether "appropriate instructions" by the trial court should include an instruction on the consequences of declaring a defendant mentally retarded. Our approach to jury instructions in capital cases involving the insanity defense informs our present case. In *State v. Hammonds*, 290 N.C. 1, 15, 224 S.E.2d 595, 604 (1976), we held the trial court erred in denying defendant's request to instruct the jury on the consequences of finding him not guilty by reason of insanity. The Court stated that "the average jury does not know what a verdict of not guilty by reason of insanity will mean to the defendant. This uncertainty may lead the jury to convict the accused in a mistaken belief that he will be set free if an insanity verdict is returned." *Id.* at 14, 224 S.E.2d at 603. The Court reasoned that

[t]o allow a jury to speculate on the fate of an accused if found insane at the time of the crime only heightens the possibility that the jurors will fall prey to their emotions and thereby return a verdict of guilty which will insure that [the] defendant will be incarcerated for his own safety and the safety of the community at large.

*Id.* at 15, 224 S.E.2d at 603. So persuaded, we adopted the rule that a defendant who interposes an insanity defense is entitled to an instruction on commitment procedures if requested. *Id.* at 15, 224 S.E.2d at 604.

Just as "the average jury does not know what a verdict of not guilty by reason of insanity will mean to the defendant," *id.* at 14, 224 S.E.2d at 603, the average jury may not understand what a finding of mental retardation will mean for a defendant. Speculation over the punishment a defendant will receive if found to be mentally retarded may cause jurors to "fall prey to their emotions" and render a finding on mental retardation based on "an overriding fear for the safety of the community," *id.* at 15, 224 S.E.2d at 603-04, rather than on the clinical evidence. *See Atkins*, 536 U.S. at 321, 153 L. Ed. 2d at 350 (noting that mental retardation "may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury"). Thus, like a defendant who interposes an insanity defense, a defendant asserting mental retardation is entitled to an instruction by the trial court regarding punishment "sufficient to remove any hesitancy of the jury in returning a [finding of mental retardation], engendered by a fear that by so doing they would be releasing the defend-

ant at large in the community." *State v. Harris,* 306 N.C. 724, 727, 295 S.E.2d 391, 393 (1982). We therefore conclude the trial court erred in failing to give defendant's requested instruction.

We further conclude that the error prejudiced defendant. Notably, although the jury rejected defendant's mental retardation claim, the jury found as mitigating circumstances many facts that would also tend to establish mental retardation on the part of defendant. For example, the jury found as mitigating circumstances that defendant: received an IQ score of sixty-five at age fourteen on the Slosson test, a scientifically standardized and accepted, individually administered test of general intelligence; was in the bottom two percent of the population in global adaptive functioning, according to testing documented in his school records; attended special education classes for educable mentally handicapped children and performed poorly throughout his school career; had significant adaptive deficits from childhood in the areas of functional academics; had learning difficulties from his earliest days; and "obtained a Full Scale IQ score of 68" on the WAIS-III test given by Dr. Timothy Hancock, which was "consistent with the score obtained by Dr. Brad Fisher on the prior version of the same test, the WAIS-R." The jury also found that defendant's cognitive impairment decreased his ability to control his impulsivity in stressful situations.

The State contends defendant cannot show prejudice because trial counsel told jurors during closing arguments that defendant would be sentenced to life imprisonment if they found him to be mentally retarded. We disagree. " '[O]n matters of law, arguments of counsel do not effectively substitute for statements by the court.' " *State v. Spruill,* 338 N.C. 612, 654, 452 S.E.2d 279, 302 (1994) (quoting *Simmons v. South Carolina,* 512 U.S. 154, 173, 129 L. Ed. 2d 133, 148 (1994) (Souter & Stevens, JJ., concurring) (alteration in original)), *cert. denied,* 516 U.S. 834, 133 L. Ed. 2d 63 (1995). This is because arguments of counsel are likely to be viewed as statements of advocacy, whereas a jury instruction is a definitive and binding statement of law. *Boyde v. California,* 494 U.S. 370, 384, 108 L. Ed. 2d 316, 331 (1990). Further, although the attorneys in their arguments referenced defendant's receiving life imprisonment, counsel for the State also argued that defendant's mental retardation claim was "about Dane Locklear avoiding punishment." In light of the jury's mitigation findings, we conclude there is a reasonable possibility the jury would have found defendant mentally retarded absent the omitted instruction. N.C.G.S. § 15A-1443(a) (2007); *State v. Lamb,* 321 N.C. 633, 644,

365 S.E.2d 600, 606 (1988) (concluding it was "not reasonably possible that, had the trial court given [the] defendant's [requested] instruction verbatim, a different result would have occurred at trial"). Defendant is therefore entitled to a new sentencing hearing. On remand, the trial court should instruct the jury in compliance with N.C.G.S. § 15A-2005(e) that "[i]f the jury determines the defendant to be mentally retarded, the court shall declare the case noncapital and the defendant shall be sentenced to life imprisonment."

In light of our decision to remand defendant's case for a new sentencing hearing, we do not address defendant's remaining arguments regarding sentencing, nor do we engage in proportionality review.

## PRESERVATION ISSUES

Defendant assigns as error multiple issues he concedes have been decided unfavorably to him in prior opinions of this Court. Most of defendant's preservation issues assign error to the sentencing proceedings. We need not address such asserted error in light of our disposition of defendant's case, but we nonetheless note that defendant presents no compelling reason to overrule our precedents on these issues. Defendant also objects to the use of a "short-form" murder indictment as constitutionally deficient. As he acknowledges, however, this Court has repeatedly and consistently upheld the legitimacy of short-form indictments for first-degree murder. *See, e.g., State v. Maness*, 363 N.C. 261, 292, 677 S.E.2d 796, 816 (2009); *State v. Lawrence*, 352 N.C. 1, 9-11, 530 S.E.2d 807, 813-14 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). Thus, we reject these arguments.

We conclude defendant received a fair trial, free from prejudicial error. However, we conclude the trial court committed prejudicial error during the sentencing proceeding. We therefore vacate defendant's death sentence and remand this case to Superior Court, Robeson County, for a new capital sentencing proceeding.

NO ERROR IN GUILT-INNOCENCE PHASE; DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

Justice MARTIN dissenting.

The trial court instructed the jury that: (1) only two sentencing options were available—death and life without parole; and (2) a find-

ing of mental retardation would eliminate death as an option. Having received these instructions, the jury was fully aware that a finding of mental retardation would mandate a sentence of life without parole.

The execution of mentally retarded defendants violates the United States Constitution, *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), and state law, N.C.G.S. § 15A-2005(b) (2007). For this reason, the trial court in a capital case must observe procedural protections designed to meet the challenges associated with identifying such defendants. The narrow issue here, however, is whether the jury in this case understood the consequences of a finding that defendant was mentally retarded.

When a defendant claims that an instruction is ambiguous and subject to erroneous interpretation, "the proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). A "reasonable likelihood" is more than a "possibility." *See id.* "[T]he proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor v. Nebraska*, 511 U.S. 1, 6 (1994) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 & n.4 (1991)); *see also State v. Smith*, 360 N.C. 341, 347, 626 S.E.2d 258, 261-62 (2006) (applying reasonable likelihood test to challenged jury instruction).

Moreover, the challenged instruction " 'may not be judged in artificial isolation, but must be viewed in the context of the overall charge,' " *Boyde*, 494 U.S. at 378 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)), and the proceedings generally, *see id.* at 381. In this regard, the United States Supreme Court has explained that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning" but rather "[d]ifferences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." *Id.* at 380-81.

This Court recently stated that, in reviewing jury instructions allegedly subject to erroneous interpretation, "we inquire whether there is a *reasonable likelihood* that the jury has applied the challenged instruction in a way that violates the Constitution. . . . In determining whether the defendant has met the reasonable likelihood

standard this Court must review the trial court's instruction to the jury in the context of the overall charge." *Smith*, 360 N.C. at 347, 626 S.E.2d at 261-62 (citations and internal quotation marks omitted).

The trial court here opened the sentencing proceeding by instructing the jury that its sole purpose was to determine which of two sentences, death or life without parole, defendant would receive: "Members of the jury, having found the defendant guilty of murder in the first degree, it is now your duty to recommend to the Court whether the defendant should be sentenced to death or to life imprisonment without parole." At no time during the sentencing proceeding was the jury advised of any potential third form of punishment, nor was the jury advised that, the defendant having been found guilty of first-degree murder, he nevertheless might be released.

"[J]urors are presumed to pay close attention to the particular language of the judge's instructions in a criminal case . . . and [to] follow the instructions as given." *State v. Trull*, 349 N.C. 428, 455, 509 S.E.2d 178, 196 (1998) (citation omitted), *cert. denied*, 528 U.S. 835 (1999). This presumption is particularly appropriate here, as the trial court's instruction was the first sentence spoken to the jury on the first day of the sentencing proceeding. As this Court recently observed: "The trial court alluded to only two possible sentences, death or life imprisonment without parole. Therefore, if the jury followed these instructions, they knew of only these two possible sentences. We must presume that the jury followed these instructions." *State v. Smith*, 359 N.C. 199, 219, 607 S.E.2d 607, 622, *cert. denied*, 546 U.S. 850 (2005).

Following presentation of mental retardation and other sentencing evidence, the trial court gave the instruction now challenged on appeal. The instruction, which tracked both state statutory law, N.C.G.S. § 15A-2005(b), and the pattern jury instruction, 1 N.C.P.I.— Crim. 150.05 (2001), read: "The law provides that no defendant who is mentally retarded shall be sentenced to death. The one issue for you to determine at this stage of the proceedings reads: Is the defendant, Dane Locklear, Jr., mentally retarded?" Having been told that its two sentencing options were death and life without parole and that a finding of mental retardation would foreclose a death sentence, the jury could reach only one reasonable conclusion: a finding of mental retardation would result in a sentence of life without parole.

That the jury understood the consequences of a finding of mental retardation is supported not only by "the context of the overall

charge," *Boyde*, 494. U.S. at 378, but also by "all that [took] place at the trial," *id.* at 381. During closing arguments on mental retardation, counsel for both parties specifically informed the jury that a finding of mental retardation would result in a sentence of life without parole. The prosecutor stated, "If Dane Locklear can prove that he is mentally retarded, then as a matter of law, he cannot be sentenced to death. And if you've been convicted of first degree murder, as he has been in this case, he has to be sentenced to life in prison without parole." Similarly, defense counsel stated, "If we show . . . that he's retarded, it's a life sentence without parole." These arguments corroborated the trial court's instructions and weigh against a conclusion that the jury's verdict was influenced by an erroneous understanding of the law. *See Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (per curiam) (explaining that a state court is not precluded "from assuming that counsel's arguments clarified an ambiguous jury charge" and that "[t]his assumption is particularly apt when it is the *prosecutor's* argument that resolves an ambiguity in favor of the *defendant*").

Read in total isolation, the challenged instruction did not rule out the possibility that a mentally retarded defendant might receive punishment other than life without parole. But the jurors did not hear the instruction in isolation. Instead, they heard the instruction in the context of a capital sentencing proceeding that the trial court had told them would result in a recommendation of either death or life without parole. It would defy "commonsense understanding," *Boyde*, 494 U.S. at 381, for the jury to speculate that the trial court would postpone the determination of mental retardation to the middle of a proceeding about death versus life imprisonment if a finding of mental retardation would make defendant eligible for some third result. This is especially true when, as in this case, both parties' counsel told the jury otherwise.

The majority compares the instant case with this Court's decision in *State v. Hammonds*, 290 N.C. 1, 224 S.E.2d 595 (1976). The majority concludes that here, as there, the trial court's instructions left the jury uninformed about the consequences of its verdict and prone to speculate that defendant would be released to the community should it find him mentally retarded. *See id.* at 15, 224 S.E.2d at 603-04. *Hammonds* is distinguishable from the instant case in two significant respects. First and foremost, the jury in *Hammonds* was never told the consequences of a verdict of not guilty by reason of insanity. *Id.* at 11, 224 S.E.2d at 601. Because defendants who are found not guilty

generally go free, the trial court's failure to inform the jury of the statutory commitment procedure may well have left the impression that an acquittal by reason of insanity would result in the release of a potentially dangerous defendant. *Id.* at 13, 224 S.E.2d at 602. Here, on the other hand, the jury had already found defendant guilty of first-degree murder when it was asked to determine whether he was mentally retarded. Because defendants who are found guilty of murder generally do not go free, and because the trial court's instructions as a whole limited the punishment for a mentally retarded defendant guilty of first-degree murder to life without parole, there was no rational basis for the jury to speculate that defendant would receive anything other than a life sentence.

Additionally, this Court noted in *Hammonds* that the jury was further confused by the prosecutor's misleading statement in closing argument that " 'if you conclude [the defendant] is not guilty [by reason of insanity], . . . he walks out of this courtroom not guilty, returned to this community.' " *Id.* at 11, 224 S.E.2d at 601. Here, in contrast, counsel for both parties corroborated the trial court's instructions by correctly informing the jury that a finding of mental retardation would result in a sentence of life without parole. Put simply, the concerns raised in *Hammonds* are not implicated here, and defendant has not shown a reasonable possibility that his requested instruction would have led to a different result at his sentencing proceeding. *See* N.C.G.S. § 15A-1443(a) (2007).

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (citations omitted). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation," *McNeil*, 541 U.S. at 437, and resentencing is improper "where the claimed error amounts to no more than speculation," *Boyde*, 494 U.S. at 380. Here, the challenged instruction did not confuse the jury or lead it to disregard "constitutionally relevant evidence" of mental retardation. *Id.* Accordingly, the trial court's instruction on mental retardation does not entitle defendant to a new sentencing proceeding.[1]

I respectfully dissent.

---

1. While the trial court's instruction does not entitle defendant to a new sentencing proceeding, the Committee on Pattern Jury Instructions may nevertheless wish to consider additional language stating that a finding of mental retardation will result in a sentence of life imprisonment without parole. *See State v. Benton*, 299 N.C. 16, 22, 260 S.E.2d 917, 921 (1980) (stating that when a challenged pattern instruction "cor-

Justice BRADY dissenting.

The majority's assertion that there was a reasonable likelihood that the jury was able to "speculate" as to defendant's fate in the sentencing proceeding ignores the contents of the record before us. Because the trial court informed the jury that a finding of mental retardation would result in a life sentence without parole, there was no prejudicial error in denying defendant's request for special mental retardation jury instructions. Therefore, I respectfully dissent.

At the charge conference, defendant orally requested a special instruction informing the jury that finding defendant to be mentally retarded would result in a sentence of life imprisonment without the possibility of parole. This specific instruction was denied. The crux of defendant's argument, and the majority opinion, is based upon the illogical reasoning that the jury was allowed to speculate that defendant could possibly "go free" and escape punishment if jurors found defendant to be mentally retarded. Defendant claims, and the majority agrees, that by denying defendant's orally requested instruction, the trial court permitted the jury to hypothesize about defendant's fate and as a result, violated defendant's due process and Eighth Amendment rights.

At the outset, I note that I could find nothing in the record indicating that defendant ever tendered a written request to the trial court for alternative or supplemented mental retardation jury instructions to the trial court. As a matter of law, "such requested special instructions 'should be submitted in *writing* to the trial judge at or before the jury instruction conference.'" *State v. Augustine*, 359 N.C. 709, 729, 616 S.E.2d 515, 530 (2005) (emphasis added) (quoting Gen. R. Pract. Super. & Dist. Cts. 21, para. 1, 2005 Ann. R. N.C. 18), *cert. denied*, 548 U.S. 925 (2006). Accordingly, this Court has repeatedly ruled that a trial court does not err when it denies oral requests for jury instructions that have not been submitted in writing. *State v. McNeill*, 346 N.C. 233, 240, 485 S.E.2d 284, 288 (1997), *cert. denied*, 522 U.S. 1053 (1998); *State v. Martin*, 322 N.C. 229, 236- 37, 367 S.E.2d 618, 622-23 (1988); *see also* N.C.G.S. § 15A-1231(a) (2007). Defendant's request was made orally at the jury charge conference and it appears that no written request was ever tendered. On this

---

rectly declared the law" and, when read in context with the entire charge to the jury, "was not so confusing as to mislead the jury or affect the verdict," the defendant was not entitled to a new trial, but suggesting that the instruction "might be reviewed by the Committee . . . for possible clarification").

basis alone, this Court should conclude that the trial court committed no error in denying defendant's requested instruction.

However, even if I choose the majority's path and overlook defendant's apparent failure to make a written request for special jury instructions, I still conclude that the trial court committed no error in denying defendant's request. The appropriate standard under which to review constitutional challenges to jury instructions is "whether there is a *reasonable likelihood* that the jury has applied the challenged instruction in a way that violates the Constitution." *State v. Smith,* 360 N.C. 341, 347, 626 S.E.2d 258, 261 (2006) (citations and internal quotation omitted). In demonstrating such a likelihood, the burden is upon the defendant "to show more than a possibility that the jury applied the instruction in an unconstitutional manner." *Id.* at 347, 626 S.E.2d at 261-62 (citations and internal quotation marks omitted). Furthermore, "[i]n determining whether the defendant has met the reasonable likelihood standard this Court must review the trial court's instruction to the jury in the context of the overall charge." *Id.* at 347, 626 S.E.2d at 262 (citations and internal quotation marks omitted).

In the instant case, during the sentencing proceeding the jury heard evidence concerning mental retardation and aggravating and mitigating circumstances. After this evidence was presented, the trial court instructed the jury to deliberate and reach a verdict solely on the mental retardation issue. Both the State and defendant's counsel presented arguments before the jury concerning mental retardation. The trial judge in this case then recited, verbatim, North Carolina Criminal Pattern Jury Instruction 150.05 when instructing the jury on mental retardation. The instruction states: "The law provides that no defendant who is mentally retarded shall be sentenced to death. The one issue for you to determine at this stage of the proceedings reads: 'Is the defendant, Dane Locklear, Jr., mentally retarded?'" *See* 1 N.C.P.I.—Crim. 150.05 (2001) (footnote call number omitted).

Before these instructions were given, defendant orally requested during the charge conference additional instructions on mental retardation specifically stating that upon a finding of mental retardation, defendant would be sentenced to life without parole. The majority is correct that "[i]f a request is made for a jury instruction which is correct in itself and supported by evidence, the trial court must give the instruction at least in substance." *State v. Harvell,* 334 N.C. 356, 364, 432 S.E.2d 125, 129 (1993) (citations omitted). However, the majority

incorrectly concludes that defendant's requested instruction was not given "in substance" to the jury. At the very outset of the sentencing proceeding, after the guilt phase and before the jury heard any evidence concerning mental retardation, the trial court instructed as follows: "Members of the jury, having found the defendant guilty of murder in the first degree, it is now your duty to recommend to the Court whether the defendant should be sentenced to death or to life imprisonment without parole." The effect of this charge at the beginning of the sentencing proceeding was to inform the jury that only two possible sentences were available for defendant—death or life imprisonment without parole. The jurors heard every piece of evidence regarding mental retardation within the context of this instruction. Defendant's argument that the jury was permitted to speculate that he would "go free" is contrary to the very first instruction jurors were given at the sentencing proceeding, which explicitly eliminated that possibility.

Defendant and the majority rely heavily upon our decision in *State v. Hammonds*, 290 N.C. 1, 224 S.E.2d 595 (1976), to argue that the denial of defendant's requested instructions was prejudicial error. *Hammonds* is noticeably distinguishable from the case *sub judice*. In *Hammonds*, this Court held that "upon request, a defendant who interposes a defense of insanity to a criminal charge is entitled to an instruction by the trial judge setting out in substance the commitment procedures outlined [by statute], applicable to acquittal by reason of mental illness."[2] *Id.* at 15, 224 S.E.2d at 604. First, the jury in *Hammonds* was considering the issue of insanity, not mental retardation. However, even assuming *arguendo* that the *Hammonds* rule is applicable to defendants who claim mental retardation, application of the rule in this case is still inappropriate. In *Hammonds*, as this Court specifically noted, during the *guilt* determination phase of the trial "the fate of defendant, should he be acquitted by reason of insanity, became a central and confusing issue in the arguments of counsel." *Id.* at 13, 224 S.E.2d at 602. Thus, the purpose of the *Hammonds* rule is "to remove any hesitancy of the jury in returning a verdict of not guilty by reason of insanity, engendered by a fear that by so doing [it] would be releasing the defendant at large in the community." *State v. Harris*, 306 N.C. 724, 727, 295 S.E.2d 391, 393 (1982). The

---

2. As noted above, even if the *Hammonds* rule were directly applicable to the instant case, defendant's instructions were given to the jury *in substance*.

Next, it is important to recognize that the defendant in *Hammonds* tendered a *written* request for supplemental jury instructions. *See* Transcript of Record at 117-24, *State v. Hammonds*, 290 N.C. 1, 224 S.E.2d 595 (1976) (No. 40).

STATE v. LOCKLEAR

[363 N.C. 438 (2009)]

same fears are not present here. The jury in the instant case was not deciding the defendant's guilt; this had already been determined in the guilt-innocence phase of the trial. Also, unlike the consequences of a verdict finding the defendant not guilty by reason of insanity in the *Hammonds* trial, there is no indication in the record that the question of what would happen to defendant upon the finding of mental retardation was confusing or ever in dispute. Both the State and counsel for defendant were in agreement and communicated to the jury during the sentencing proceeding that if defendant was found to be mentally retarded, he would be sentenced to life in prison without parole. Thus, the fears the *Hammonds* rule was designed to eliminate were not present in the case *sub judice*.

Additionally, when defense counsel orally requested special mental retardation jury instructions at the charge conference, the State reminded the trial court that the instruction had previously been given at the beginning of the sentencing proceeding. The trial court then asked, "[i]s there anything to prevent counsel for either the State or defendant arguing the law as it relates to what type of punishment would be imposed upon a finding of either mental retardation or no mental retardation?" This prompted a discussion in which the State confirmed with the trial court that counsel was entitled to argue before the jury that if it found defendant to be mentally retarded "he will be sentenced in accordance with the law of the state of North Carolina to life in prison without parole[.]" Therefore, at the time the trial judge denied defendant's oral request, he was acutely aware that the jury had already received the same instruction and that counsel could again explain the instruction during closing arguments. "Jurors need adequate instructions, but they do not need to hear them repeated *ad nauseam*." *State v. Garcell*, 363 N.C. 10, 60, 678 S.E.2d 618, 649 (2009); *see also State v. Gainey*, 355 N.C. 73, 107, 558 S.E.2d 463, 485, *cert. denied*, 537 U.S. 896 (2002). It was reasonable and within the trial court's discretion to deny defendant's additional request for supplemental jury instructions based on the consideration that those instructions would be superfluous in light of the trial court's initial instructions and arguments of counsel.

Counsel for the State and defendant informed the jury that a finding of mental retardation would result in a sentence of life imprisonment without parole. During closing arguments, counsel for the State asserted: "If Dane Locklear can prove that he is mentally retarded, then as a matter of law, he cannot be sentenced to death. And if you've been convicted of first degree murder, as he has been in this

case, *he has to be sentenced to life in prison without parole.*"
(Emphasis added.) Likewise, defense counsel clearly explained in his
closing argument that defendant would be sentenced to life without
parole if the jury found defendant to be mentally retarded:

> [A]s you know and you heard, when a person is mentally
> retarded, it doesn't get any better. Doesn't get any better. You
> know, nobody can make somebody who's retarded smart. Can't
> do it. He's fixed that way for life. It's a sad thing, but it is, and
> that's why we have this law, 15A-2005. If we show these things,
> that he's retarded, *it's a life sentence without parole.* You don't
> execute children. You don't execute mentally retarded.

(Emphasis added.)

The majority opinion asserts that under *State v. Spruill*, "argu-
ments of counsel do not effectively substitute for statements by the
court." 338 N.C. 612, 654, 452 S.E.2d 279, 302 (1994) (quoting
*Simmons v. South Carolina*, 512 U.S. 154, 173 (1994) (Souter &
Stevens, JJ., concurring)), *cert. denied*, 516 U.S. 834 (1995). However,
the majority uses this statement out of context. In *Spruill*, this Court
referenced the above statement from Justice Souter's concurring
opinion in *Simmons v. South Carolina* to support the proposition
that a "trial court has a duty to censor any remarks not warranted by
evidence or law." *Id.* This Court cited Justice Souter's concurring
remarks in relation to a trial court's responsibility to correct mis-
statements of law or fact interjected by counsel during closing argu-
ments. *Spruill* does not speak to whether it is sufficient for counsel
to correctly inform the jury of matters of evidence and law. Even if
the statement from *Spruill* is on point with the instant case, the
majority still ignores that here, the trial court instructed the jury on
the two sentencing options—life imprisonment without parole or the
death penalty—at the outset of the sentencing proceeding. Thus, the
remarks made by counsel during closing arguments were repetitions
of instructions already given by the trial court and were not "substi-
tutions for," but rather elaborations of, "statements by the court."

Finally, the majority claims that defendant was prejudiced
because the State "argued that defendant's mental retardation claim
was 'about Dane Locklear avoiding punishment.' " To suggest that the
jury could possibly have misconstrued these statements to believe
that defendant would someday be released from prison is unconvinc-
ing. When the complete statement is read in context, it is clear that
the prosecutor was insinuating no such thing:

STATE v. LOCKLEAR

[363 N.C. 438 (2009)]

So, then, you ask yourselves, well, why are they saying he's mentally retarded now? For one reason and one reason only. If Dane Locklear can prove that he is mentally retarded, then Dane Locklear cannot face the ultimate consequences for what he has done. If Dane Locklear can prove that he is mentally retarded, then as a matter of law, he cannot be sentenced to death. And if you've been convicted of first degree murder, as he has been in this case, he has to be sentenced to life in prison without parole. That's what this diagnosis is about. This diagnosis is not about Dane Locklear being mentally retarded from the time he was a child, throughout his life. This diagnosis is about Dane Locklear avoiding punishment.

The State plainly tells the jury that if defendant does not receive the death penalty "he has to be sentenced to life in prison without parole." This remark appears just two sentences before the statement the majority finds prejudicial. "Statements or remarks in closing argument 'must be viewed in context and in light of the overall factual circumstances to which they refer.'" *State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007) (quoting *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995), *cert. denied*, 516 U.S. 1148 (1996)), *cert. denied*, —— U.S. ——, 129 S. Ct. 59, 172 L. Ed. 2d 58 (2008). When read in context, it is clear that the State was not suggesting that if the jury found defendant to be mentally retarded he would one day be eligible for parole. Defendant was not prejudiced by these statements.

Considering that the jury was instructed at the beginning of the sentencing proceeding that defendant would either receive the death penalty or life imprisonment without parole, and that both the State and defense counsel reiterated these points during closing arguments, it is inconceivable that any juror was confused about defendant's fate should the jury decide he was mentally retarded. As such, there is no reasonable likelihood that the jury could have applied the given instructions in a way that violated defendant's constitutional rights. The majority has succumbed to engaging in pure speculation rather than accepting the reality of the record before us. Accordingly, I respectfully dissent.

Justice NEWBY joins in this dissenting opinion.