IN THE SUPREME COURT OF NORTH CAROLINA

No. 235PA10

FILED 27 JUNE 2013

STATE OF NORTH CAROLINA

　　　　　v.

JOHN EDWARD BREWINGTON


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 204 N.C. App. 68, 693 S.E.2d 182 (2010), finding prejudicial error in a judgment entered on 13 February 2009 by Judge Arnold O. Jones, II in Superior Court, Wayne County, and ordering that defendant receive a new trial. Heard in the Supreme Court on 12 February 2013.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Special Deputy Attorney General, and Daniel P. O'Brien, Assistant Attorney General, for the State-appellant.*

*Anna S. Lucas for defendant-appellee.*

EDMUNDS, Justice.


Defendant John Edward Brewington's conviction for possession of cocaine was reversed by the Court of Appeals on the grounds that his right to confront the witnesses against him, guaranteed by the Sixth Amendment to the Constitution of the United States, was violated. Because we conclude that defendant's confrontation rights were adequately preserved, we reverse.

At about 10:15 p.m. on 18 January 2008, Goldsboro Police Officer James Serlick observed defendant riding a bicycle on Potley Street. None of the lights or reflectors legally required for riding after dark were on the bicycle, so the officer stopped defendant and asked for identification. When the officer further asked defendant if he was carrying either drugs or a weapon, defendant gave Officer Serlick consent to search his person. During the ensuing pat-down, the officer touched something that "felt like a rock" on the inside of defendant's left leg. Officer Serlick pulled defendant's sock down and a napkin fell out. The officer opened the napkin and saw "an offwhite rock-like substance" that he believed to be cocaine. Officer Serlick seized the substance, then arrested defendant and transported him to the magistrate's office. Defendant was indicted for possession of cocaine, in violation of N.C.G.S. § 90-95(a)(3).

At defendant's trial, the State presented evidence to establish chain of custody of the seized substance. Officer Serlick testified that he placed the rock-like substance in a plastic bag, initialed it, added such routine information as the case number, defendant's name, the item number, and the date and time the item was recovered, and then secured the plastic bag in an evidence locker. The material subsequently was transported to the North Carolina State Bureau of Investigation (SBI) laboratory, where it was analyzed by Assistant Supervisor in Charge Nancy Gregory. However, at trial, evidence of the identity of the material found in

defendant's sock was presented through the testimony of SBI Special Agent Kathleen Schell.

Before Agent Schell reached the crux of her testimony as to the chemical analysis of the substance, defense counsel objected and moved to exclude her testimony on the grounds that Agent Schell "didn't actually do the analysis in the case," and, as a result, defendant was "not able to cross-examine this person . . . . because her opinion is not going to be based on an actual test done to the item of evidence . . . , her opinion is going to be based solely on what some other person did and wrote down in a report." The trial court allowed an extensive voir dire of Agent Schell, then denied defendant's motion.

Continuing her testimony before the jury, Agent Schell described how an item submitted to the SBI laboratory is given a unique identification number and how the progress of such an item is tracked. She identified Agent Nancy Gregory as her supervisor and described Agent Gregory's training and experience. Agent Schell then reported how preliminary color tests are performed on a substance, followed by more specific tests tailored to the results of the color tests. She advised that the chemist who does the testing prepares a report and that the data and resulting report are reviewed by another SBI chemist, adding that her own duties include conducting such reviews. The record indicates that Agent Gregory's laboratory report was not admitted into evidence. Agent Schell's direct testimony

concluded with the prosecutor asking whether she had formed an opinion, based upon her review of the results of Agent Gregory's testing, as to the identity of the substance. Defendant again objected but his objection was overruled. Agent Schell testified that, in her opinion, the substance was cocaine base. Defendant thereafter cross-examined Agent Schell carefully and extensively, leaving no doubt that Agent Schell did not personally perform or observe any of the tests she relied on in forming her opinion.

On appeal, defendant argued that his rights secured under the Confrontation Clause of the Sixth Amendment were violated when the trial court permitted Agent Schell to testify that the substance found on defendant was cocaine based solely on Agent Gregory's notes and lab report. Relying heavily on the Supreme Court of the United States' decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), the Court of Appeals found that the admission of Agent Schell's testimony constituted "an expert utilizing data collected by another person to form an independent opinion," *State v. Brewington*, 204 N.C. App. 68, 77, 693 S.E.2d 182, 188 (2010), and determined that admission of the testimony violated the Confrontation Clause, *id.* at 82-83, 693 S.E.2d at 191-92.

The Court of Appeals noted that Agent Schell testified that she " 'would have come to the same conclusion that [Agent Gregory] did,' " but only "if Agent Gregory followed procedures" and "if [she] did not make any mistakes." *Id.* at 80, 693 S.E.2d

at 190. The court continued that "it is precisely these 'ifs' that need to be explored upon cross-examination to test the reliability of the evidence" and concluded that permitting Agent Schell to testify about the composition of the substance tested, and to identify it as cocaine, was error. *Id.* The Court of Appeals further found that no other concrete evidence identified the substance as cocaine and concluded that the admission of Agent Schell's testimony was not harmless error. Accordingly, the Court of Appeals ordered a new trial. *Id.* at 82-83, 693 S.E.2d at 192.

We allowed the State's petition for discretionary review and now reverse the holding of the Court of Appeals. This Court has recently considered the scope of protections provided by the Confrontation Clause of the Sixth Amendment in *State v. Ortiz-Zape*, ___ N.C. ___, ___ S.E.2d ___ (2013) (329PA11). In *Ortiz-Zape*, after conducting an exhaustive review of current Confrontation Clause jurisprudence, we determined that "when an expert gives an opinion, the opinion is the substantive evidence and the expert is the witness whom the defendant has the right to confront." *Id.* at ___, ___ S.E.2d at ___. In addition, we stated that "admission of an expert's independent opinion based on otherwise inadmissible facts or data 'of a type reasonably relied upon by experts in the particular field' does not violate the Confrontation Clause so long as the defendant has the opportunity to cross-examine the expert." *Id.* at ___, ___ S.E.2d at ___. Here, Agent Gregory's lab notes were not admitted into evidence. Instead, as in *Ortiz-Zape*, Agent Schell presented an independent opinion formed as a result of her own analysis, not mere surrogate

testimony.  *See id.* at ___, ___ S.E.2d at ___.  Defendant was able to conduct a vigorous and searching cross-examination that exposed the basis of, and any weaknesses in, Agent Schell's opinion.  Accordingly, we conclude that defendant's Confrontation Clause rights were not violated.

The decision of the Court of Appeals is reversed.

REVERSED.


Justice HUDSON dissenting.


Because the majority here relies entirely on what I see as the flawed analysis in *State v. Ortiz-Zape*, ___ N.C. ___, ___ S.E.2d ___ (2013) (329PA11), I will not repeat the discussion from my dissenting opinion there.  I write specifically to draw attention to the ways in which the majority here has gone even farther astray than in *Ortiz-Zape*.

In *Ortiz-Zape* Agent Ray described her review of the testing analyst's work.  According to the majority's opinion, "Ray compared the machine-produced graph to the data from the lab's sample library and concluded that the substance was cocaine." *Ortiz-Zape*, ___ N.C. at ___, ___ S.E.2d at ___.  Although it is clear from the testimony that Ray merely gleaned the conclusion from the report (She admitted that "I can only say according to the worksheet."), she was asked, "What is your independent expert opinion?" and answered, "My conclusion was that the

substance was cocaine." *Id.* at ___, ___ S.E.2d at ___. Here, by contrast, Agent Schell was not asked and made no attempt to characterize her testimony as an "independent expert opinion." Rather, she was asked if she had "reviewed . . . the results of the examinations" performed by the testing analyst and if she had "also reviewed Agent Gregory's conclusion[.]" She testified that "[b]ased upon all the data that [Agent Gregory] obtained from the analysis of that particular item . . . *I would have come to the same conclusion that she did.*" (Emphasis added.) This testimony is problematic.

As with every other Confrontation Clause case we decide today, a central question is whether the analyst's opinion is independent or not. The independence of the testifying expert's opinion becomes crucial when, as here, the lab report underlying that opinion is testimonial and the analyst who prepared the report did not testify. Under these circumstances, the report and its conclusions are usually inadmissible under the Confrontation Clause. A truly independent expert opinion may serve as evidence in the case, while an opinion based solely on review of and agreement with the inadmissible report is constitutionally infirm. Here, Agent Schell did nothing more than review Agent Gregory's notes and results and agree with her conclusion. Agent Schell's opinion was entirely based on another's work and notes, and involved no independent analysis whatsoever.

Moreover, while Agent Ray in *Ortiz-Zape* avoided reference to the original analyst's conclusions, Agent Schell actually introduced through her testimony

Agent Gregory's conclusion from the lab report—the very conclusion that the trial court had explicitly ruled was inadmissible without testimony from Agent Gregory. Agent Schell testified that she "[came] to the same conclusion that [Agent Gregory] did," and then reported to the jury that conclusion: that the substance was 0.1 grams of cocaine base. In so testifying, Agent Schell informed the jury of the absent analyst's testimonial conclusion and thereby acted as a surrogate rather than an independent witness. This directly violates the rule in *Bullcoming*, in that Agent Gregory, not Agent Schell, should have been made available for cross-examination to satisfy the Confrontation Clause. "[S]urrogate testimony . . . could not convey what [the certifying analyst] knew or observed about the events this certification concerned, *i.e.*, the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." *Bullcoming v. New Mexico*, ___ U.S. ___, ___, 131 S. Ct. 2705, 2715 (2011) (footnote omitted).

Finally, the majority in *Ortiz-Zape* purports to find independent state law grounds to uphold the conviction, claiming that any possible constitutional error was harmless in light of other evidence establishing the chemical identity of the substance. Even if that analysis were correct—and it is not—no such escape valve exists in this case. Here, the officer testified on direct examination that he arrested defendant because he observed something he "believed" to be crack cocaine fall out of defendant's sock during a pat-down and that he took "the cocaine" into evidence.

Even if visual identification of crack cocaine by a layperson were permissible—a question this Court has not addressed, though the Court of Appeals has consistently ruled that it is not—such visual identification could hardly be considered "overwhelming evidence" of guilt sufficient to rebut the strong presumption that constitutional error is prejudicial. *See State v. Autry*, 321 N.C. 392, 399-400, 364 S.E.2d 341, 346 (1988). I would hold that the State has failed to prove harmless error beyond a reasonable doubt.

Through this and the other opinions released today, the majority has declined to follow the guidance of the U.S. Supreme Court's recent Sixth Amendment opinions, from *Crawford* through *Williams*, and has thus failed to protect a defendant's right to confront witnesses against him. The majority asserted in *Ortiz-Zape*, and again here, that "when an expert gives an opinion, the opinion is the substantive evidence and the expert is the witness whom the defendant has the right to confront." This statement completely ignores the Supreme Court's explanations of the scope of the Sixth Amendment's Confrontation Clause. Indeed, if that statement were law, any expert could give an opinion based on any outside inadmissible evidence, no matter how clearly testimonial or pointedly designed to prove an element of the State's case, without running afoul of the Confrontation Clause. This is precisely the type of problem that the Supreme Court has repeatedly addressed since *Crawford*, and most recently in *Williams*. The majority may disagree with the rulings of the United States Supreme Court, but we are

nonetheless bound by them, as we are bound by the Constitution of the United States.  Because in my view this decision, as that in *Ortiz-Zape*, is inconsistent with this Supreme Court jurisprudence, I must respectfully dissent.

Chief Justice PARKER joins in this dissenting opinion.

Justice BEASLEY dissenting.

Because defendant's right to confront the witnesses against him as guaranteed by the Sixth Amendment to the Constitution of the United States was violated, I respectfully dissent.  The majority's rule allowing a substitute expert to provide the sole evidence of a critical element of the charged offense through an "independent opinion" diminishes our Confrontation Clause analysis. Instead, I would examine whether the information offered is critical to the State's case so as to determine its true and actual purpose and thus, whether the Confrontation Clause was violated.

The following facts are necessary for a proper decision in this case.  At trial, Agent Schell testified that Agent Gregory is her supervisor.  She then testified as to her knowledge of Agent Gregory's experience and training, in addition to her own. Agent Schell then outlined the general testing procedure for determining whether a

substance is cocaine. She described the security measures in place to track the reports that are produced and ensure they are not changed. The State next produced the sample sent to the lab for testing and the envelope in which it was returned to law enforcement. Referring to Agent Gregory's notes, Agent Schell testified to when testing was performed and what kinds of tests were performed, describing the testing procedure and reason for each test. The first test described was a color test:

> Q. And concerning this particular sample, can you just explain first the first color test, what kind of test that was and how it was performed?
>
> . . . .
>
> Q. And from the notes that you retrieved were you able to determine what the result was of this particular color test?
>
> A. In this particular test it did not turn any color.

Agent Schell testified that the failure to change color is a negative result, indicating particular chemicals are not present. She then explained that a second color test was performed, testifying as to how one typically performs it and what it indicates.

> Q. And when you reviewed this particular case, did you see the results of this test?
>
> A. I did.
>
> Q. And what was the result of that test?
>
> A. It turned blue.

Again, she testified as to the results of the next test:

Q. And based on your review of the lab report, were you able to determine what the result was of this particular test?

A. Yes, crosses were obtained. Those specific crosses were obtained.

She testified that this indicates the substance is cocaine. Yet again, Agent Schell testified as to the last test: although this time, the question asked and her testimony spoke more directly to the specific process employed:

Q. And was any other test performed then?

A. A more specific instrumental test was performed.

Q. Can you describe how that test was performed?

. . . .

Q. And in this particular case did you review the results of that particular test?

A. I did.

Q. And what were the results?

A. In this case the graph produced, there was a mixture of cocaine base and bicarbonate, which is just baking soda. So further tests had to be conducted.

. . . .

Q. And what happened when that was done?

A. A graph was produced using that same instrument and it was a clean graph of just cocaine base.

Q. Now during your tests—during your explanation of the tests . . . ?

Agent Schell then testified that she reviewed the tests performed and the results obtained and provided her opinion:

> A. Based upon all the data that [Agent Gregory] obtained from the analysis of that particular item, State's Exhibit 1B, I would have come to the same conclusion that she did.
>
> Q. And what is your opinion as to the identity of the substance that was submitted as State's Exhibit 1B?
>
> [objection/overruled]
>
> . . . .
>
> A. State's Exhibit 1B is the Schedule II controlled substance cocaine base. It had a weight of 0.1 gram.

On cross-examination Agent Schell testified that she did not personally perform the tests, as noted by the majority. Most significantly, defense counsel asked, "And they sent you here to testify from that person's notes who actually did the test; is that right?" to which Agent Schell responded, "That is correct."

Based on these facts and the Confrontation Clause precedent that is binding on this Court, I would hold that it is a violation of the Confrontation Clause to offer a substitute analyst's opinion on the identity of a controlled substance when that opinion relies upon testing performed by another analyst and seeks to serve as evidence or proof of a critical element of the offense, though purportedly not offered for the truth of the matter asserted. I would hold it is a further violation to admit the report of the testing analyst as the basis for that expert opinion.

The Confrontation Clause mandates that defendants have the right to ensure

that any evidence, let alone essential evidence, be vulnerable to its shortcomings and exposed for any falsities that underlie it. *See* U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004). When the report at issue, entered into evidence or not, addresses a critical element of the offense charged, it inherently operates "against" the defendant, and any person responsible for authoring that evidence becomes a witness against him. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) ("[U]nder our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment."). In these cases the very nature of the details of the lab report go beyond testimonial evidence; these details are essential evidence required by statute and are thus valuable for the truth of the matter asserted. Consequently, when the truth of the matter asserted in a lab report is critical to the State's case, and not merely evidence to bolster the State's case, any attempt to reveal the substance of that report, regardless of the stated purpose, without making its author available for cross-examination necessarily violates the defendant's right to confront witnesses against him. *See Bullcoming v. New Mexico*, ___ U.S. ___, ___, 131 S. Ct. 2705, 2710 (2011) ("The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—*made for the purpose of proving a particular fact*—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement." (emphasis

added)); *Melendez-Diaz*, 557 U.S. at 311 fn. 1 ("It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must . . . be introduced live."). It is not sufficient to only permit the defendant to expose the inadequacies in the testifying expert's opinion, for this fails to address concerns regarding the critical evidence itself. In fact there will likely not be any inadequacies to expose in the testifying expert's opinion when the opinion is merely recitation of factual results obtained from the tests of another.

The rule and principles that I set forth above are consistent with the decision of the United States Supreme Court in *Bullcoming*:

> Principal evidence against Bullcoming was a forensic laboratory report certifying that Bullcoming's blood-alcohol concentration was well above the threshold for aggravated DWI. At trial, the prosecution did not call as a witness the analyst who signed the certification. Instead, the State called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample.
>    The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.

*Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2709-10. The facts presented to this Court

today fall squarely under the ruling in *Bullcoming.*

Just as in *Bullcoming*, here the principal evidence against defendant was that which the State submitted through the testifying expert. The evidence at issue—a substance identified as a controlled substance—is most assuredly critical to the State's case: without it a conviction is not statutorily possible. The State made no showing that the testing analyst was unavailable, and defendant did not have a prior opportunity to cross-examine the testing analyst. Because the evidence at issue is directly prohibited by *Bullcoming* and is central to defendant's conviction, a violation of the Confrontation Clause occurred, and the violation was not harmless beyond a reasonable doubt.

The majority in *State v. Ortiz-Zape*, ___ N.C. ___, ___ S.E.2d ___ (2013) (329PA11), upon which the majority here relies, held that the "admission of an expert's independent opinion based on otherwise inadmissible facts or data 'of a type reasonably relied upon by experts in the particular field' does not violate the Confrontation Clause so long as the defendant has the opportunity to cross-examine the expert." *Ortiz-Zape*, ___ N.C. at ___, ___ S.E.2d at ___. In this case the majority determines that the expert opinion was independent and the underlying information relied upon was not offered for the truth of the matter asserted. This holding contradicts the United States Constitution, United States Supreme Court precedent, and this Court's precedent.

To permit independent opinion testimony on a critical element of the offense when that opinion is based on evidence presented at trial "not for the truth of the

matter asserted" is to permit the North Carolina Rules of Evidence to preempt the Confrontation Clause. Rules 703 and 705 of the North Carolina Rules of Evidence generally allow expert testimony in the form of an opinion, including provision of the information reasonably relied upon to reach the expert opinion. But these Rules are entirely without effect when they contradict the Confrontation Clause. The Supremacy Clause of the United States Constitution has long required, as recognized by this Court on numerous occasions, such a hierarchy of authority:

> This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2; *Stephenson v. Bartlett*, 355 N.C. 354, 369, 562 S.E.2d 377, 388 (2002) ("When federal law preempts state law under the Supremacy Clause, it renders the state law invalid and without effect."). In sum, the majority's opinion bypasses the Confrontation Clause by using the North Carolina Rules of Evidence; such an outcome is impermissible under the Supremacy Clause.

In *Crawford* the United States Supreme Court held that rules of evidence cannot be used to escape the Confrontation Clause:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable

-17-

> by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, *but it is a procedural rather than a substantive guarantee.* It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

541 U.S. at 61 (emphasis added) (citations omitted) (overruling its prior decision in *Ohio v. Roberts*, 448 U.S. 56 (1980), which permitted testimonial evidence to be admitted so long as it was deemed reliable, regardless of whether there was an opportunity for confrontation). Thus, not only did the Court hold that rules of evidence are secondary to the Confrontation Clause, but the Court expressed that the Confrontation Clause is concerned not just with whether the information was *reliable*, but with whether the information can be determined to be *truthful* in open court. The only way to make that determination is to confront the individual from whom the information originated.

Here the majority relies on the North Carolina Rules of Evidence to admit evidence about the identity of a chemical substance on the grounds that "basis information" is admissible when an expert lays the foundation that the information on which she relied is the same as that on which others in her field would rely in forming an opinion on the identity of the substance. The first problem with this rationale is that the majority focuses on whether the information was reliably obtained and reliably used, or used in a reliable and common manner. This

question is not among the concerns raised in *Crawford* that serve as the basis for the Court's application of the Confrontation Clause; instead, this question directly aligns with the concerns of *Ohio v. Roberts* that *Crawford* overruled. *See id.* Reliability of this kind is an *evidentiary* question. The Confrontation Clause addresses a *procedural* question: whether the defendant has the opportunity to determine, in front of the jury, if the information relied upon is reliable at all or is in fact a lie. *See id.*; *see also Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2715 ("[S]urrogate testimony of the kind [the testifying expert] was equipped to give could not convey what [the testing analyst] knew or observed about the events his certification concerned, *i.e.,* the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." (footnote omitted)).

Our Court has previously recognized this procedural concern. *State v. Ward*, 364 N.C. 133, 147, 694 S.E.2d 738, 747 (2010) ("The practical effect of the *Melendez-Diaz* ruling is that through cross-examination more light is being shed on the procedures expert witnesses use to support their testimony. In some instances, when practices are illuminated 'in the crucible of cross-examination,' their shortcomings become apparent." (citation omitted)); *id.* at 156, 694 S.E.2d at 752 (Newby, J., dissenting) ("The Confrontation Clause is a 'procedural . . . guarantee.' Those accused of criminal offenses are entitled to cross-examine the witnesses against them." (alteration in original) (internal citation omitted)). Furthermore, in cases such as this, the ability to cross-examine the testifying expert does not

adequately address the procedural concern at issue: whether the testing analyst performed the tests correctly. *See Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2716 ("[T]he Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination."). The likelihood of a procedural violation becomes especially important when the evidence or information in question goes to a critical element of the offense.

It is true that an expert would rely upon the tests performed by the testing analyst, as relied on here by Agent Schell, to show the identity of a substance. These tests comply with the generally accepted scientific methods of proving that a substance is indeed an illicit drug. But this truth addresses an evidentiary question of reliability and not the procedural one at issue in Confrontation Clause analysis. With respect to the procedural concern, the testifying expert cannot verify that no mistakes were made in the testing or that the results generated by the testing analyst were not based on false information, error, or lies. This information cannot be ascertained without the right to confront the testing expert. It is precisely because of these lapses in procedure that the Confrontation Clause commands that the State present the testing analyst to testify. Because the State did not present such a witness in this case, it violated defendant's Sixth Amendment rights.

While the majority here, relying on *Ortiz-Zape*, contends that *Bullcoming* is distinguishable because the expert here is not a surrogate but is testifying to her own "independent" opinion about the reports, *Bullcoming* is directly on point with

this case. Nothing in Agent Schell's opinion is "independent"; in fact, the veracity of Agent Schell's testimony is dependent on the validity and accuracy of Agent Gregory's testing methods. If Agent Gregory's testing was faulty, Agent Schell's testimony is inaccurate. Thus, without Agent Gregory's testimony, there is no reliable way to determine that the identity of the substance to which Agent Schell is testifying is accurate. The United States Supreme Court provided a very appropriate visual in *Bullcoming* that describes exactly what the State is attempting to do here and very clearly precludes it:

> Most witnesses, after all, testify to their observations of factual conditions or events, *e.g.*, "the light was green," "the hour was noon." Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact—Bullcoming's counsel posited the address above the front door of a house or the read-out of a radar gun. Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically "No." See *Davis v. Washington*, 547 U.S. 813, 826, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (Confrontation Clause may not be "evaded by having a note-taking police[ officer] recite the . . . testimony of the declarant" (emphasis deleted)); *Melendez-Diaz*, 557 U.S., at ___, 129 S.Ct., at 2546 (KENNEDY, J., dissenting) ("The Court made clear in *Davis* that it will not permit the testimonial statement of one witness to enter into evidence through the in-court testimony of a second.").

*Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2714-15 (alterations in original) (internal citation omitted).

Here, much like the radar gun hypothetical, Agent Schell is merely testifying to the observations of another witness. *Bullcoming* directly forbids this. *Id.* Agent Schell even admits on cross-examination to such a recitation of Agent Gregory's notes. In fact, the majority of Agent Schell's testimony recites the recordation of visual observations made by Agent Gregory, exactly like the Supreme Court's radar gun example. She testified with respect to the color tests: "In this particular test it did not turn any color," and, "It turned blue." Again, Agent Schell testified: "Yes, crosses were obtained. Those specific crosses were obtained." These are visual observations. There is no difference between this testimony and testifying, "It read fifty-five miles per hour," with respect to an officer's notes about what he saw on the radar gun. The only way to know the accuracy of the result of these tests is to *observe* them. The same logic applies to the weight of the substance: "It had a weight of 0.1 gram." Agent Schell could not know this with any sense of "independent" knowledge unless she personally verified that the scales were calibrated, personally executed the testing protocol properly, and observed the weight on the scale itself. In fact, the State's phrasing of the questions to Agent Schell indicates a request for exact recitation of Agent Gregory's notes and visual observations: "And *from the notes* that you retrieved were you able to determine what the result *was* of this particular color test?"; "[W]ere you able to determine what the result *was* of this particular test?"; "[D]id you *see* the results of this test?" (Emphases added.) This testimony directly violates the rule in *Bullcoming*. Whether referred to as an independent opinion or a peer review, testimony

regarding these matters could only be based on the analyst's actual observance of a factual and visual occurrence.

When a jury is capable of drawing the same conclusions as the substitute expert if given the same information (*i.e.*, the report), this is indicative that the expert is merely parroting the testing analyst's results. Here if the jury were handed the report that stated the sample "turned blue" and told that blue indicated the presence of cocaine, a jury would conclude that the sample was cocaine. No expert knowledge is necessary and could not possibly produce an "independent" opinion outside that provided in the report. We must not create a back door to evade the Confrontation Clause by merely changing the diction from "surrogate" to "independent opinion."

Furthermore, there is no difference between handwritten notes to document an officer's observation of radar gun results and machine-produced data to document the results of a chemical test prepared and set up by a live person. Both leave room for falsification, entry error, sample error, or any number of other errors. The majority in *Ortiz-Zape* declares that machine-generated results may not operate as a witness against a defendant and thus are impervious to the Confrontation Clause:

> Because machine-generated raw data, "if truly machine-generated," are not a statement by a person, they are "neither hearsay nor testimonial." We note that "representations[] relating to past events and human actions not revealed in raw, machine-produced data" may not be admitted through "surrogate testimony." Accordingly, consistent with the Confrontation Clause, if

> "of a type reasonably relied upon by experts in the particular field," raw data generated by a machine may be admitted for the purpose of showing the basis of an expert's opinion.[1]

*Ortiz-Zape*, ___ N.C. at ___, ___ S.E.2d at ___ (internal citations omitted). The same majority reiterates this conclusion in *State v. Brent*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2013) ("Thus, machine-generated raw data, if of a type reasonably relied upon by experts in the field, may be admitted to show the basis of an expert's opinion."). Yet, such data serves as a receipt of human action the same way a note does.

In fact, the majority's opinions completely obscure the very safeguard the majority's own rule regarding such machine-generated data puts in place: the concerns of the Confrontation Clause are alleviated only when the data are "*truly machine-generated.*" *Ortiz-Zape*, ___ N.C. at ___, ___ S.E.2d at ___. It is precisely that limitation that recognizes the procedural concern of the Confrontation Clause. Because the majority ignores this limitation, as is apparent by its lack of analysis in

---

[1] This assertion grows out of the majority's reference to Justice Sotomayor's concurring opinion in *Bullcoming*, which notes that *Bullcoming* did not present a question of an independent opinion or reliance on results that were purely machine-generated. *Id.* at ___, 131 S. Ct. at 2722 (Sotomayor, J., concurring). Such a reference provides no support to the majority's position. This Court is not bound by the dicta within a concurring opinion of a single Justice of the Supreme Court. Further, the plurality opinion in *Williams*, authored by Justice Alito, made the same attempt to distinguish its case from *Bullcoming* by using Justice Sotomayor's observation. Justice Alito declared, "We now confront that question." *Williams*, ___ U.S. at ___, 132 S. Ct. at 2233. Yet, Justice Sotomayor joined Justice Kagan in the dissent in *Williams*, declaring that a Confrontation Clause violation had occurred. *See id.* at ___, 132 S. Ct. at 2264-65 (Kagan, J., dissenting). Thus, while Justice Sotomayor may have observed that the question would be different when it involved an "independent" opinion or machine-generated results, she declared that the answer is the same.

*Ortiz-Zape* and in *Brent*, the majority obscures the fact that the Confrontation Clause necessarily applies here. The Supreme Court made clear in *Crawford* that reliability (an evidentiary concern) does not preclude the fact that the concern of the Confrontation Clause (a procedural one) may still be present. *See Crawford*, 541 U.S. at 61. The Confrontation Clause is not concerned with whether the machine itself reliably produced the results (the evidentiary concern); it is concerned with whether the testing analyst actually followed a reliable procedure in order to allow the machine to produce a reliable result (the procedural concern).

Here the majority concludes that the expert opinion was "independent" and, by way of reference to the majority opinion in *Ortiz-Zape*, that the report was not used for the truth of the matter asserted because it was only used to support this "independent opinion" of a qualified expert. It is necessary to note that the majority acknowledges that without qualifying as "basis information" for the expert's opinion, the information is "otherwise inadmissible." *Brewington*, ___ N.C. at ___, ___ S.E.2d at ___; *see also Ortiz-Zape*, ___ N.C. at ___, ___ S.E.2d at ___. This inadmissibility stems directly from the fact that the evidence violates the Confrontation Clause if it is used for the truth of the matter asserted. Thus, it is necessary to determine whether the report was indeed used for the truth of the matter asserted. This determination is informed by the critical role the report plays in the State's case and by the testimony.

In *State v. Llamas-Hernandez*, 363 N.C. 8, 673 S.E.2d 658 (2009) (per curiam), this Court adopted the dissenting opinion from the Court of Appeals

concluding that chemical testing was required to identify a substance as powder cocaine. *Id.* In *Ward* this Court extended that rule to cover pills requiring "very technical and specific chemical designation[s]" that "imply the necessity of performing a chemical analysis to accurately identify controlled substances." *Ward*, 364 N.C. at 143, 694 S.E.2d at 744 (majority opinion) (alterations in original) (citations and internal quotation marks omitted). Further,

> [b]y imposing criminal liability for actions related to counterfeit controlled substances, the legislature not only acknowledged that their very existence poses a threat to the health and well-being of citizens in our state, but that a scientific, chemical analysis must be employed to properly differentiate between the real and the counterfeit. . . . As such, a scientifically valid chemical analysis of alleged controlled substances is critical to properly enforcing the North Carolina Controlled Substances Act.

*Id.* at 143-44, 694 S.E.2d at 745. Thus, this Court has held that chemical testing is required to establish the identity of any alleged controlled substance *and* that such testing must be "scientifically valid." *Id.* The State did not introduce any such substantive evidence of chemical testing; thus, the Confrontation Clause was violated.

In addition to conflicting with the precedent of this Court, the majority's opinion, through the majority opinion in *Ortiz-Zape*, relies on case law that is without effect or weight here. First among these is the United States Supreme Court's recent decision in *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221 (2012).

In *Williams* the Supreme Court failed to reach a majority opinion. Instead, it

decided the case with a four-one-four plurality, with Justice Thomas concurring in the judgment, but offering an alternative rationale. Justice Thomas directly rejected the reasoning used by the plurality and its conclusion that the report was not used for the truth of the matter asserted and instead concurred solely on the basis that the report lacked the formality required of testimonial statements. *Id.* at ___, 132 S. Ct. at 2256 (Thomas, J., concurring in the judgment) ("[T]here was no plausible reason for the introduction of Cellmark's statements other than to establish their truth."). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . ." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted). In *Williams* the only common, and thereby narrowest, ground between Justice Thomas's concurrence and the plurality opinion is that there is no Confrontation Clause violation in a case having the exact fact pattern of *Williams*. *Williams*, thus, is simply not binding upon this case.[2]

---

[2] In fact, the only certainty that can be derived from *Williams* that is applicable to this case is that, had the report in *Williams* possessed the testimonial qualities of solemnity and formality that Justice Thomas was looking for, Justice Thomas would have likely found a Confrontation Clause violation. *See* ___ U.S. at ___, 132 S. Ct. at 2259-61. Here the report was certified by Agent Gregory's supervisor and prepared for the purpose of serving as evidence against defendant. There is no question that it is testimonial in nature, even under Justice Thomas's standards. *See id.*; *Bullcoming,* ___ U.S. at ___, ___, 131 S. Ct. at 2710, 2713-14 (holding a laboratory report that contained a "Certificate of Analyst" was testimonial); *Melendez–Diaz,* 557 U.S. at 308, 310 (finding laboratory reports testimonial when they were sworn to before a notary public by the testing analysts).

The majority next relies on *State v. Fair*, 354 N.C. 131, 557 S.E.2d 500 (2001), *cert. denied*, 535 U.S. 1114 (2002) and, by implication, also on *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009 (1985). In *Huffstetler* this Court opined that "[t]he admission into evidence of expert opinion based upon information not itself admissible into evidence does not violate the Sixth Amendment guarantee of the right of an accused to confront his accusers where the expert is available for cross-examination." 312 N.C. at 108, 322 S.E.2d at 120 (citations omitted). In *Fair* this Court stated that "[a]n expert may properly base his or her opinion on tests performed by another person, if the tests are of the type *reasonably relied upon* by experts in the field." 354 N.C. at 162, 557 S.E.2d at 522 (emphasis added) (citations omitted). The majority relies on these cases for its position that the information upon which an expert relies to formulate his or her opinion may be admitted as the basis for that opinion without violating the Confrontation Clause because the defendant has the opportunity to cross-examine the testifying expert on the substantive evidence, which is only the opinion of the testifying expert.

Foremost, these cases predate *Melendez-Diaz*, *Bullcoming*, and this Court's own decision in *State v. Locklear*, 363 N.C. 438, 681 S.E.2d 293 (2009). *Huffstetler* was decided in 1984, well before the Supreme Court's 2004 ruling in *Crawford* that changed the Confrontation Clause landscape. *Fair*, decided in 2001, also predates *Crawford*. To the extent either conflicts with *Crawford* and its progeny, they are overruled. With respect to *Huffstetler*, this conflict with *Crawford* is most apparent

in the references to reliability.

*Ohio v. Roberts* permitted the admission of testimony without confrontation when the statements satisfied various indicia of reliability. 448 U.S. at 66. In *Crawford* the Supreme Court unambiguously overruled *Roberts*, regardless of what the Rules of Evidence may dictate. 541 U.S. at 60, 61, 63, 65, 68-69. Because this Court's entire evaluation of the Confrontation Clause claim in *Huffstetler* concerned the reliability of the expert opinion and its status as an exception to the hearsay rule, 312 N.C. at 106-08, 322 S.E.2d at 119-21 (concluding that because the information was "inherently reliable" and "reasonably relied upon" by other experts in the field there could be no violation of the Confrontation Clause (internal citations omitted)), *Crawford* directly overrules *any* precedent set by *Huffstetler*, making it entirely invalid for purposes of Confrontation Clause jurisprudence. In turn, because this Court's opinion in *Fair* relied almost exclusively on the rationale developed in *Huffstetler*, *Fair*, 354 N.C. at 162-63, 557 S.E.2d at 522, *Fair* is also void.

Further, *Huffstetler* and *Fair* are entirely distinguishable from this case. In both, the testifying expert had actually seen and directly examined the sample in question at some point. *Fair*, 354 N.C. at 163, 557 S.E.2d at 522 (noting that the testifying expert physically examined the clothing cutouts and held them up to the clothing to confirm from where they were cut); *Huffstetler*, 312 N.C. at 105-06, 322 S.E.2d at 119 (noting that the testifying expert had performed some of the tests on the samples to determine the blood grouping). Thus, these testifying experts were

not working *solely* from the reports of the testing analysts and added some of their own *independent* work to the information derived from the underlying reports. In contrast, here the expert had *only* the report of the testing analyst, had *never* personally tested the actual sample, and had *never* touched or seen it until trial. Her opinion was entirely *dependent* upon the work of the testing analyst, in direct contradiction to the holding in *Bullcoming*.

That the evidence in question here goes to the heart of what the State is required to prove further distinguishes this case from those upon which the majority relies. *Williams* dealt with DNA matching that amounted to "bolstering evidence" to suggest that the defendant was the perpetrator. The defendant could have been convicted without DNA evidence; thus, the DNA was not evidence needed to prove an essential element of the crime. Similarly, *Huffstetler* and *Fair* were both homicide cases in which the evidence in question was not direct proof required to establish an essential element of the crime. *See Fair*, 354 N.C. at 136-39, 557 S.E.2d at 507-08 (examining testimony regarding DNA testing with respect to the Confrontation Clause evidence, amid other evidence implicating the defendant in the victim's murder, including possession of the alleged murder weapon, use and possession of the victim's credit cards, lay witness testimony, and prior statements made by the defendant); *Huffstetler*, 312 N.C. at 96-99, 105-06, 322 S.E.2d at 114-15, 119 (addressing evidence of blood matches with respect to the Confrontation Clause, amid a slew of other evidence implicating the defendant in the victim's murder, including the alleged murder weapon). Conversely, in *Bullcoming* the

evidence at issue went to prove an essential element of the crime—an elevated blood alcohol level—without which the defendant could not be convicted. *Bullcoming*, ___ U.S. at ___, 131 S. Ct. at 2709 ("Principal evidence against Bullcoming was a forensic laboratory report certifying that Bullcoming's blood-alcohol concentration was well above the threshold for aggravated DWI."). Thus, this case is bound by *Bullcoming*.[3]

The parallel to *Bullcoming* becomes more apparent in the context of the majority's opinion in *State v. Craven*, ___ N.C. ___, ___ S.E.2d ___ (2013) (holding that the testifying expert was a mere "surrogate"), decided concurrently with this case. That the majority in *Craven* holds a Confrontation Clause violation occurred under the precedent of *Bullcoming*, but fails to do so here, is a remarkable demonstration of the semantics embodied in the term "independent opinion." In *Craven* the State asked the substitute analyst, who coincidentally was also Agent Schell, whether she reviewed the reports of the testing analyst and whether she agreed with the results of the report. She answered both questions affirmatively.

---

[3] Our Court's decision in *Locklear* is both valid and factually applicable to this case as well. In *Locklear* this Court recognized the firm precedent set by *Crawford* and concluded that it was a violation of the Confrontation Clause to admit the opinion testimony of a forensic analyst as to the reports and findings of two nontestifying forensic analysts with respect to the cause of death and identity of the victim. 363 N.C. at 451-52, 681 S.E.2d at 304-05. This Court, however, found that the violation was harmless because the State had presented "other evidence of" a second, unrelated murder allegedly committed by the same defendant, and "[n]either fact [provided by the testifying expert regarding the other victim] was *critical* . . . to the State's case against defendant for the murder [for which the defendant was being tried]." *Id.* at 453, 681 S.E.2d at 305 (emphasis added). As mentioned above, the evidence presented in this case through Agent Schell's testimony was most certainly "critical" to the State's case.

*Craven*, ___ N.C. at ___, ___ S.E.2d at ___. That exact same procedure was followed here: Agent Schell stated that she did not perform the tests, but reviewed the reports of the testing analyst and agreed with the conclusions. In both *Craven* and the case *sub judice* the information at issue goes to a critical element of the offense charged. Yet, in *Craven* the fatal error to achieving the classification of "independent opinion" as observed by the majority was that the State then asked, "What was [the testing analyst's] conclusion?" Here the State asked for Agent Schell's opinion. This is mere semantics.

In overruling *Roberts*, the Supreme Court made clear that the Confrontation Clause is concerned with more than just hearsay. *Crawford*, 541 U.S. at 51 ("[N]ot all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them."). Thus, it is not enough to only examine the diction that a witness employs to provide another's statement; our courts must examine the substance of what is said as well. When both opinions are determined to be the same by the substitute expert's own statement of agreement with the testing analyst, and when the substitute analyst's opinion is entirely dependent upon the information provided by the testing analyst, there is no practical or logical basis for excluding one opinion over the other: the *substance* is still a violation of the

Confrontation Clause because of the procedural concern raised under the circumstances. The defendant's constitutional right to confrontation must not hinge on such a charade of diction.

Further, the majority's inconsistency between *Craven* and this case actually encourages the State to produce *less* evidence in order to secure a conviction while circumventing the Confrontation Clause. This paradox is a result of the factual nuance between the cases: in *Craven* the testimonial reports of the nontestifying testing analyst were admitted into evidence without the pretext of their serving as "basis information," whereas here the reports were not admitted. The majority's opinion does not turn on this nuance[4] but by virtue of the result, the majority elevates this nuance to significance. Yet the form in which the testimonial statements are admitted should have no bearing on our Confrontation Clause analysis, especially when the information at issue goes to a critical element of the offense charged.

Lab reports are "testimonial in nature." *Melendez-Diaz*, 557 U.S. at 311 (concluding that "[lab] analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment"). When the substance of the testimony presented by the substitute analyst is specifically derived from the lab reports such that there can be no independent opinion because

---

[4] The majority in *Craven* holds that it is not the admission of the reports that trigger the Confrontation Clause, but the admission of the surrogate analyst's statements themselves: "[T]he *statements* introduced by Agent Schell constituted testimonial hearsay, triggering the protections of the Confrontation Clause." ___ N.C. at ___, ___ S.E.2d at ___.

this information is admitted for the truth of the matter asserted, as demonstrated above is the case here, the information too is testimonial in nature. The form does not change the substance, nor does form change the original source. Whether the information contained in the lab reports was admitted in written form, or in oral form through Agent Schell's testimony, our Court must address the Confrontation Clause procedural concern. The jury still receives the same information without presenting a defendant the opportunity to expose the potential falsities or weaknesses therein. Consequently, it appears an even more egregious violation of the Confrontation Clause to permit only oral testimony of this critical element of the charged offense, eviscerating the importance of the admission of the signed lab report, especially considering the statutory requirements.

The rule I propose today would not unreasonably impede the State's opportunity to offer proof of all necessary elements of the crime. Under *Crawford* the State may utilize such testimonial evidence when it can show "unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. While perhaps inconvenient, this is not too high a hurdle to impose to protect our citizens' constitutional rights. *See Melendez-Diaz*, 557 U.S. at 325 ("The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination. The Confrontation Clause—like those other constitutional provisions—is binding, and we may not disregard it at our convenience."). Moreover, I fear our lower courts will be left with no guidance on what constitutes an "independent opinion" when data

are "truly machine-generated," and when a violation of the Confrontation Clause has occurred. The rule I propose would provide clear guidance to the lower courts when determining what constitutes a violation of the Confrontation Clause, consistent with the United States Constitution, the previous guidance of both this Court and the United States Supreme Court, and common sense.

In the exercise of that rule, it is clear that today we are presented with a case in which the State offered a testifying expert to parrot the report of the nontestifying testing analyst in order to admit evidence of a critical element of the offense charged. Today we are presented with a case that mimics *Bullcoming*. Today we are presented with a case that clearly violates the Confrontation Clause.